**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Criminal No. ELH-11-0508** |
| **DANIEL BLUE,** | * | |
| **Defendant.** | * | |

...oOo...

**GOVERNMENT'S RESPONSE TO**
**DEFENDANT'S PRETRIAL MOTIONS**

The United States of America, by and through its attorneys, Rod J. Rosenstein, United

States Attorney for the District of Maryland, and John W. Sippel, Jr., Assistant United States

Attorney for said District, submits this Response to defendant Daniel Blue's Motion to Suppress

Statements (docket no. 15), Motion for Disclosure of Confidential Informant (docket no. 16),

Motion of Severance of Counts (docket no. 17), Motion to Suppress Tangible and Derivative

Evidence or, in the alternative, for a *Franks* Hearing (docket no. 19), and Motion to Suppress

Tangible Evidence (docket no. 20).[1]

## I. INTRODUCTION

On December 7, 2011, a grand jury sitting in the District of Maryland issued a three-

count superseding indictment against the defendant Daniel Blue and co-defendant Keith

Townsend, charging defendant Blue with conspiracy to distribute and possess with intent to

distribute 100 grams or more of heroin in violation of 21 U.S.C. § 846, and two counts of

possession with intent to distribute heroin in violation of 21 U.S.C. § 841. Defendant Blue seeks

suppression of (1) all evidence seized from him at the time of his arrest, (2) all evidence

---

[1] Defendant Keith Townsend has not filed any pretrial motions.

obtained as a result of a search and seizure warrant issued on July 13, 2011, (3) statements made by defendant Blue at or after the time of his arrest on July 13, 2011, and (4) a *Franks* hearing. In addition, Blue seeks disclosure of the identity of a confidential informant and severance of counts of the indictment. As discussed fully below, the evidence in the case was not obtained in violation of the defendant's constitutional rights, and the other motions are not supported by the evidence and applicable law. Accordingly, the defendant's motions should be denied.

## II. STATEMENT OF FACTS

On June 29, 2011, Baltimore City Police Department detectives were conducting a narcotics investigation in the 700 block of N. Curley Street in Baltimore City, Maryland. The detectives had received information from a confidential source that co-defendant Keith Townsend, who resided at 715 N. Curley Street, was selling narcotics. The detectives learned from the confidential source that Townsend was a "middle-man," meaning that Townsend would be fronted narcotics from a source of supply and would then sell the narcotics to street-level purchasers, making a small profit. The detectives learned that Townsend would leave his residence, obtain narcotics from various individuals, and would hold the narcotics for a short period of time, usually less than half an hour.

Detectives then placed themselves in a covert location with a clear and unobstructed view of the 700 block of N. Curley Street. The confidential source, who was with the detectives in the covert location, placed a telephone call to Townsend and ordered 50 grams of heroin. Townsend told the confidential source that he would call him back. Townsend then called the confidential source and informed him that he would be ready to meet with the confidential source to sell him narcotics in fifteen minutes. Approximately fourteen minutes later, detectives observed

Townsend exit the residence located at 715 N. Curley Street and walk towards the corner of E. Madison and N. Curley Street. Townsend then met with defendant Blue. The detectives observed Blue hand Townsend a brown object. Townsend then placed the object, which was clenched in his left hand, in his left front pants pocket. Based on their experience, training, and knowledge, the detectives believed that they had observed a hand-to-hand drug transaction between Blue and Townsend.

Townsend then walked towards his residence located at 715 N. Curley Street, and Blue headed in the opposite direction, entered a gold Honda Accord bearing Maryland registration number 3FSF80, and drove away before law enforcement officers could stop him. An arrest team then approached Townsend. Townsend attempted to enter his residence quickly but law enforcement officers were able to stop him prior to entering the residence. Townsend attempted to reach into his left front pants pocket and then tried to pull away from the officers. Townsend was then placed under arrest and searched. A plastic bag with a piece of bread was recovered from Townsend's left front pants pocket. Townsend uttered to the law enforcement officers, "That's just my sandwich." An officer looked inside of the bread and recovered 50 grams of heroin in a plastic bag. No other items were recovered from Townsend.

The entire transaction between Blue and Townsend was witnessed by BPD detectives and was also captured on video by a Baltimore City Police pole camera.

Based upon a review of court records, detectives learned that Blue had a court proceeding on July 13, 2011, at the District Court of Maryland at 1400 E. North Avenue in Baltimore City. Detectives began surveillance in the area and observed Blue enter the courthouse. Detectives located Blue's vehicle and place a portable global position system ("GPS") tracking device on

Blue's vehicle. Blue exited the courthouse and entered his vehicle along with another male. Detectives were able to follow Blue to Fox Hall Apartments in Baltimore County, Maryland. Blue pulled into Rosecrans Place and entered building number 7. The passenger in Blue's car did not exit the vehicle. Approximately five minutes later, Blue exited the apartment building carrying a white container in his hand. Blue got into his car and drove away.

Detectives were able to follow Blue to the Lake Montebello area in Baltimore City. Lake Montebello is well known to law enforcement officers for the illegal narcotics transactions that occur in the area. Blue parked and exited his vehicle. As he walked across a playground in the area, he looked in all directions in a nervous manner. Blue approached an individual later identified as Jamar Holt. Blue and Holt then walked towards a Jeep Cherokee with Maryland registration number 1AH2150. Blue continued to scan the area as the men approached the vehicle. The men entered the vehicle and drove around Lake Montebello. At the entrance of Lake Montebello, the vehicle stopped and Blue exited. Holt then drove away. Based on what the detectives had observed, they decided to follow Holt.

Holt was followed to the 1400 block of Fillmore Street where detectives activated the emergency lights on the detectives' vehicle and conducted a traffic stop on Holt's vehicle. One of the detectives approached Holt's vehicle from the front and ordered Holt to show his hands. Holt then raised a black handgun and pointed it at the detective. One detective drew and discharged his service weapon. Holt then attempted to strike one of the detectives with his vehicle, and the detective discharged his service weapon at the vehicle. Holt left the scene at a high rate of speed. The vehicle was located hours later in the 1200 block of Chase Street in Baltimore City. A blood trail was located outside of the vehicle. Holt was arrested hours later

after he arrived at a local hospital with complaints of gunshot wounds.

With the assistance of the portable GPS tracking device placed on Blue's vehicle earlier that day (July 13th), detectives were able to locate Blue's vehicle in the 4900 block of Sinclair Lane in Baltimore City. The other male that had been observed in Blue's vehicle as Blue left the courthouse was seated in Blue's vehicle. Detectives observed Blue exit the residence located at 4913 Sinclair Lane and enter his vehicle. Blue was then stopped and detained by detectives.

Blue was advised of the *Miranda* warnings, indicated that he understood his rights, and agreed to speak with police officers. During the interview with detectives, Blue denied that he had exited the residence located at 4913 Sinclair Lane. Based on training, knowledge, and experience, detectives knew that drug dealers commonly lie to law enforcement officers about their residences because drug dealers often store illegal narcotics, drug paraphernalia, and currency in their residences. Blue was also asked about his meeting with Holt. Blue admitted to the detectives that he had met with Holt earlier that day (July 13th) to discuss a drug transaction. Blue was also asked if he had traveled to an apartment complex in the White Marsh area of Baltimore County earlier that day. Blue advised that he had not left Baltimore City and did not go to White Marsh. The detectives advised Blue that he had been followed to the Fox Hall Apartments located on Rosecrans Place earlier that day. Blue then admitted that he had lied to the detectives and was at the apartment complex earlier that day. Blue was asked by detectives which apartment he had entered and Blue responded that he had not entered any of the apartments. The detectives then advised Blue that detectives had observed Blue enter building number 7. Blue then stated that he had entered a different building. Again, based on their training, knowledge, and experience, the detectives know that is it common for drug dealers to

lie about where they live.  The interview ended and Blue was placed under arrest based on his

participation in the drug transaction with co-defendant Townsend that occurred on June 29,

2011.  Blue was searched incident to his arrest and keys were recovered.  Detectives took the

keys and drove to the Fox Hall Apartment complex that Blue was observed entering.  Detectives

then entered building number 7 and placed the keys seized from Blue into door locks to

determine which apartment Blue had entered.  One of the keys seized from Blue unlocked the

lock on the door for apartment #1-D in building number 7.  Police entered the apartment and

secured the location while a search and seizure warrant was prepared.

On the evening of July 13, 2011, the Honorable Karen Friedman of the District Court of

Baltimore City signed search and seizure warrants for the residences located at 4913 Sinclair

Lane in Baltimore City, Maryland, and 7 Rosecrans Place, Apartment 1-D, in Nottingham,

Maryland.  *See* Search and Seizure Warrant, attached hereto as Exhibit 1.[2]  During the execution

of the warrant at 7 Rosecrans Place, Apartment 1-D, detectives recovered approximately 120

grams of heroin from within the apartment.

### III.  ARGUMENT

**A.**     **The Physical Evidence Was Not Obtained In Violation Of The Fourth Amendment**

   **1.**     **Blue's Warrantless Arrest Was Based On Probable Cause**

It is well-settled under Fourth Amendment jurisprudence that a police officer may

lawfully arrest an individual in a public place without a warrant if the officer had probable cause

to believe that the individual has committed, is committing, or is about to commit a crime.

---

[2]  The warrant document was not numbered.  Government counsel has placed page
numbers in the lower right corner for purposes of this response and ease of reference.

*United States v. Dickey-Bey*, 393 F.3d 449, 453 (4th Cir. 2004)(citations omitted).  "'[P]robable

cause' to justify an arrest means facts and circumstances within the officer's knowledge that are

sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the

circumstances shown, that the suspect has committed, is committing, or is about to commit an

offense."  *Id.* (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

Whether there is probable cause to arrest depends on the totality of the circumstances.

*Dickey-Bey*, 393 F.3d at 453 (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1983)).  The Fourth

Circuit has explained the probable cause standard as "facts and circumstances with the officer's

knowledge [which] would warrant the belief of a prudent person that the arrestee had committed

or was committing an offense," giving deference to the expertise and experience of law

enforcement officers at the scene.  *Dickey-Bey*, 393 F.3d at 453 (citations omitted).

In this case, detectives had probable cause to arrest defendant Blue on July 13, 2011,

after detectives observed Blue selling heroin to co-defendant Townsend on June 29, 2011.

Indeed, detectives utilized a confidential informant to order 50 grams of heroin from Townsend.

Within a few minutes after the confidential informant contacted Townsend to place his order for

heroin, Townsend was observed meeting with Blue on N. Curley Street at the intersection with

E. Madison Street.  Detectives observed Blue hand Townsend an object that he placed in his left

front pants pocket.  Detectives stopped Townsend and recovered 50 grams of heroin from

Townsend's left front pants pocket.  The entire sequence of events is corroborated by video

taken by a pole camera.  Based on the totality of the circumstances, there was ample probable

cause to arrest Blue.

## 2. Blue Was Lawfully Searched Incident To His Arrest

"It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." *United States v. Robinson*, 414 U.S. 218, 224 (1973). This exception provides that when law enforcement officers have probable cause to make a lawful custodial arrest, they may - incident to that arrest and without a warrant - search "the arrestee's person and the area 'within his immediate control.'" *Chimel v. California,* 395 U.S. 752, 763 (1969). "Such searches have long been considered valid because of the need 'to remove any weapons that [the arrestee] might seek to use in order to resist arrest or effect his escape' and the need to prevent the concealment or destruction of evidence." *New York v. Belton,* 453 U.S. 454, 457 (1981)(quoting *Chimel,* 395 U.S. at 763). However, "[t]he constitutionality of a search incident to an arrest does not depend on whether there is any indication that the person arrested possesses weapons or evidence. The fact of a lawful arrest, standing alone, authorizes a search." *DeFillippo,* 443 U.S. at 35. This is a "bright line" rule of constitutional law. *United States v. Porter,* 738 F.2d 622, 627 (4th Cir.1984) (*en banc*).

As discussed above, there was probable cause to arrest defendant Blue and, therefore, law enforcement officers were permitted to search him. Blue had keys in his possession at the time of his arrest on July 13, 2011. Because there was probable cause to arrest defendant Blue based upon his participation in the June 29th drug transaction with Townsend, the search of defendant Blue incident to his lawful arrest did not violate the Fourth Amendment and the evidence seized - a set of keys - should not be suppressed.

### 3. The Heroin Was Seized Pursuant To A Valid Search Warrant

#### a. The Warrant Was Based On Probable Cause

The determination of probable cause by the issuing magistrate is entitled to great deference from a reviewing court. *United States v. Hodge,* 354 F.3d 305, 309 (4th Cir. 2004). The Court's duty "'is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.'" *Id.* (quoting *Illinois v. Gates,* 462 U.S. 213, 238-39 (1983)). Although the concept of probable cause cannot be defined precisely, it "exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found" in the place to be searched. *Ornelas v. United States,* 517 U.S. 690, 696 (1996). A probable cause assessment requires the issuing judge to decide whether, given the totality of the circumstances, there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates,* 462 U.S. at 238.

Moreover, the Supreme Court has "specifically cautioned against 'hypertechnical' scrutiny of affidavits lest police officers be encouraged to forgo the warrant application process altogether." *United States v. Robinson*, 275 F.3d 371, 380 (4th Cir. 2001) (quoting *Gates*, 462 U.S. at 236). The probable cause standard does not "require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to fit in neatly, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information." *Taylor v. Farmer*, 13 F.3d 117, 121 (4th Cir. 1993).

The Maryland District Court judge who signed the search and seizure warrant on July 13,

2011, for Blue's residence located at 7 Rosecrans Place in Nottingham, Maryland,[3] relied on the

following facts to ascertain whether there was a fair probability that contraband or evidence of a

crime would be found:

- on June 29, 2011, Baltimore City Police Department detectives were conducting a narcotics investigation in the 700 block of N. Curley Street in Baltimore City, Maryland. The detectives received information from a confidential source that co-defendant Keith Townsend, who resided at 715 N. Curley Street, was selling narcotics (Exhibit 1 at 9);

- detectives then placed themselves in a covert location in the 700 block of N. Curley Street. The confidential source, who was with the detectives in the covert location, placed a telephone call to Townsend and ordered 50 grams of heroin. Townsend told the confidential source that he would call him back. Townsend then called the confidential source and informed him that he would be ready to meet with the confidential source to sell him narcotics in fifteen minutes (Exhibit 1 at 9);

- approximately fourteen minutes later, detectives observed Townsend exit the residence located at 715 N. Curley Street and walk towards the corner of E. Madison and N. Curley Street. Townsend then met with Blue. The detectives observed Blue hand Townsend a brown object. Townsend then placed the object in his left pants pocket (Exhibit 1 at 9);

- Blue then entered a gold Honda Accord bearing Maryland registration number 3FSF80, and drove away before law enforcement officers could stop him. Townsend then called the confidential source and ready to sell drugs to him. An arrest team then approached Townsend and stopped him. A plastic bag with a piece of bread was recovered from Townsend's left front pants pocket. An officer looked inside of the bread and recovered heroin in a plastic bag (Exhibit 1 at 9);

- detectives learned that Blue had a court proceeding on July 13, 2011, at the District Court of Maryland at 1400 E. North Avenue in Baltimore City. Blue exited the courthouse and entered his vehicle along with another male. Detectives were able to follow Blue to Fox Hall Apartments in Baltimore County, Maryland. Blue pulled into Rosecrans Place and entered building number 7. Approximately five minutes later, Blue exited the apartment building carrying a white container

---

[3] Because no contraband was seized from the residence located at 4913 Sinclair Lane, the Government addresses only the warrant pertaining to 7 Rosecrans Place, Apartment 1-D, where over 100 grams of heroin was seized.

in his hand.  Blue got into his car and drove away (Exhibit 1 at 10);

•  Detectives were able to follow Blue to the Lake Montebello area in Baltimore
   City.  Lake Montebello is well known to law enforcement officers for the illegal
   narcotics transactions that occur in the area.  Blue parked and exited his vehicle.
   As he walked across a playground in the area, he looked in all directions in a
   nervous manner.  Blue approached an individual later identified as Jamar Holt.
   Blue and Holt then walked towards a Jeep Cherokee with Maryland registration
   number 1AH2150.  Blue continued to scan the area as the men approached the
   vehicle.  The men entered the vehicle and drove around Lake Montebello.  At the
   entrance of Lake Montebello, the vehicle stopped and Blue exited.  Holt then
   drove away.  Based on what the detectives had observed, they decided to follow
   Holt (Exhibit 1 at 10);

•  Holt was followed to the 1400 block of Fillmore Street where detectives activated
   the emergency lights on the detectives's vehicle a conducted a traffic stop on
   Holt's vehicle.  One of the detectives approached Holt's vehicle from the front
   and ordered Holt to show his hands.  Holt then raised a black handgun and
   pointed it at the detective.  One detective drew and discharged his service
   weapon.  Holt then attempted to strike one of the detectives with his vehicle, and
   the detective discharged his service weapon at the vehicle.  Holt left the scene at a
   high rate of speed.  The vehicle was located hours later in the 1200 block of
   Chase Street in Baltimore City.  A blood trail was located outside of the vehicle
   (Exhibit 1 at 10-11);

•  detectives were able to locate Blue's vehicle in the 4900 block of Sinclair Lane in
   Baltimore City.  The other male that had been observed in Blue's vehicle as Blue
   left the courthouse was seated in Blue's vehicle.  Detectives observed Blue exit
   the residence located at 4913 Sinclair Lane and entered his vehicle.  Blue was
   then stopped and detained by detectives (Exhibit 1 at 11);

•  Blue was advised of the *Miranda* warnings, indicated that he understood his
   rights, and agreed to speak with police officers.  During the interview with
   detectives, Blue denied that he had exited the residence located at 4913 Sinclair
   Lane.  Based on training, knowledge, and experience, detectives knew that drug
   dealers commonly lie to law enforcement officers about their residences because
   drug dealers often store illegal narcotics, drug paraphernalia, and currency in their
   residences.  Blue was also asked about his meeting with Holt.  Blue admitted to
   the detectives that he had met with Holt earlier that day to discuss a drug
   transaction.  Blue was also asked if he had traveled to an apartment complex in
   the White Marsh area of Baltimore County earlier that day.  Blue advised that he
   had not left Baltimore City and did not go to White Marsh.  The detectives
   advised Blue that he had been followed to the Fox Hall Apartments located on
   Rosecrans Place earlier that day.  Blue then admitted that he had lied to the

detectives and was at the apartment complex earlier that day. Blue was asked by detectives which apartment he had entered and Blue responded that he had not entered any of the apartments. The detectives then advised Blue that detectives had observed Blue enter building number 7. Blue then stated that he had entered a different building. Again, based on their training, knowledge, and experience, the detectives know that is it common for drug dealers to lie about where they live. The interview ended and Blue was placed under arrest based on his participation in the drug transaction with co-defendant Townsend that occurred on June 29, 2011 (Exhibit 1 at 11-12);

• Blue was searched incident to his arrest and keys were recovered. Detectives took the keys and drove to the Fox Hall Apartment complex that Blue was observed entering. Detectives then entered building number 7 and placed the keys seized from Blue into door locks to determine which apartment Blue had entered. One of the keys seized from Blue unlocked the lock on the door for apartment #1-D in building number 7 (Exhibit 1 at 12).

Collectively, these facts provide ample reasons for the issuing court to determine that there was a fair probability that contraband or evidence of a crime would be found and that there was probable cause to issue the search and seizure warrant for the residence located at 7 Rosecrans Place, Apartment 1-D, in Nottingham, Maryland. Blue was observed by detectives participating in a drug deal with co-defendant Keith Townsend. Blue was then observed entering the apartment complex located at 7 Rosecrans Place. Blue then drives to Lake Montebello and was observed meeting with Holt. After the meeting, Holt shot his way through police after they attempt to stop him. Blue was then stopped and interviewed. During the interview, Blue was not forthright with his answers. After his arrest, keys were seized and detectives ascertained that the keys were for the residence located at 7 Rosecrans Place, Apartment 1-D, in Nottingham, Maryland. The affidavit here contained corroborative facts and allowed the issuing judge to draw additional inferences that, when viewed in their totality, provided ample probable cause to believe that contraband and/or evidence would be found at 7 Rosecrans Place, Apartment 1-D. As the search warrant was supported by probable cause, defendant Blue's motion to suppress

should be denied.

### b.     The Search Warrant Satisfies The Good Faith Exception

Even if the warrant in this case was not supported by probable cause, the evidence seized should not be suppressed because the warrant satisfies the good faith exception to the exclusionary rule.  "Under the good faith exception to the warrant requirement, evidence obtained from an invalidated search warrant will be suppressed only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause."  *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993) (quoting *United States v. Leon*, 468 U.S. 897, 926 (1984)).

In *Leon*, the Supreme Court explicated the "good faith exception" to the exclusionary rule regarding evidence seized pursuant to an invalid warrant.  The Court stated:

> We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion. We do not suggest, however, that exclusion is always inappropriate in cases where an officer has obtained a warrant and abided by its terms.  "[S]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness," *Illinois v. Gates*, 462 U.S. [213,] 267 [(1983)] (White, J., concurring in judgment), for "a warrant issued by a magistrate normally suffices to establish" that a law enforcement officer has "acted in good faith in conducting the search."  *United States v. Ross*, 456 U.S. 798, 823, n.32 (1982).  Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, *cf. Harlow v. Fitzgerald*, 457 U.S. 800, 815-819 (1982), and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.

468 U.S. at 922-23.  In reaching this conclusion, the Court emphasized that the standard for assessing the officer's good faith reliance on the magistrate's probable cause determination is

one of objective reasonableness, and held:

> In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.

*Id.* at 926; *see also United States v. Edwards*, 798 F.2d 686, 690 (4th Cir. 1986) (noting that under *Leon*, the exclusionary rule does not bar admission of evidence obtained by officers "acting in reliance on the search warrant which was issued by a detached and neutral magistrate but ultimately found to be invalid").

The Court has enumerated four situations when an officer's reliance on a warrant would not be reasonable and therefore the good faith exception would not apply:

(1)      the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the truth;

(2)      the magistrate wholly abandoned her detached and neutral judicial role;

(3)      the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render the belief in the existence of probable cause entirely unreasonable; and

(4)      the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers could not presume it to be valid.

*See United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995) (citing *Leon*, 468 U.S. at 923).

In his motion to suppress, Blue argues that the Leon good faith exception should not apply because "the affidavit provides only conclusory allegations about whether a crime even occurred, and, if so, what evidence of that crime might be found in the residences searched." *See*

Motion to Suppress Tangible and Derivative Evidence (docket no. 19) at 8-9. As discussed more fully above, the warrant was based on specific facts and not conclusory allegations. Indeed, the affidavit indicates that detectives arranged for the purchase of narcotics from Townsend. Detectives then observed Blue meet with Townsend, Blue handed Townsend an object that Townsend then placed in his left front pants pocket. At the time of his arrest, detectives retrieved heroin hidden in a piece of bread from Townsend's left front pants pocket, and no other items were found in Townsend's left front pants pocket. Blue was then followed to the 7 Rosecrans Place location and observed entering and exiting the location. Based on these specific facts, defendant Blue's assertion that the affidavit contained conclusory allegations is not supported by the detailed facts contained in the affidavit. Moreover, Blue has not made any credible allegation of dishonesty, recklessness, or any similar criticism of the detective's affidavit. In addition, there is no allegation that the state judge "abandoned his detached and neutral role" in issuing the warrant. The affidavit was detailed and not the sort of bare-bones recital of conclusory allegations such as would appear on its face to be lacking in indicia of probable cause. Finally, the warrant was facially valid, particularizing the place to be searched and the things to be seized. Accordingly, in the event that the Court concludes that the warrant was not supported by probable cause, the *Leon* good faith exception should be applied.

### c. The Warrant Was Not Based on Unsworn Testimony

In his Motion to Suppress Tangible and Derivative Evidence (docket no. 19), Blue argues that the subject search warrants in this case are invalid because they are based on unsworn testimony. *See* Motion to Suppress Tangible and Derivative Evidence (docket no. 19) at 10. As discussed below, Blue's argument is wholly frivolous.

The Applications for Search and Seizure Warrant and Affidavit in support for both residences in this case were completed by Detective William A. Bearde. Exhibit 1 at 1-2, 13. The Applications indicate that Detective Bearde appeared before a judge, was placed under oath, and signed the Applications and Affidavit in support of the warrants. Exhibit 1 at 1-2, 13. The warrant that was issued by the issuing judge, however, contains a typographical error, indicating that Detective Shane Lettau, rather than Detective William A. Bearde, had appeared before the judge to be sworn and sign the Applications and Warrants. While it is unfortunate that Detective Lettau's name appears on the warrant and is an obvious typographical error overlooked during the preparation of the warrant, it is clear that Detective Bearde appeared before the issuing judge and signed the Applications and Affidavit. Accordingly, Blue's argument and attempt to invalidate the warrant should be rejected by the Court.

### d.        The Use Of A GPS Tracker Does Not Invalidate the Warrant

### 1.        The Use of the GPS Tracking Device

The events in the investigation and ultimately in the arrest of Blue preceded the Supreme Court's decision in *United States v. Jones*, 132 S. Ct. 945 (2012). At the time of the placement of the GPS on Blue's vehicle on July 13, 2011, investigators' installation and use of the GPS device was lawful. *See, e.g., Stone v. State*, 941 A.2d 1238, 1249-51 (Md. Ct. Spec. App. 2008) (warrantless use of GPS tracking device does not violate Fourth Amendment).

### 2.        State of the Law at the Time of GPS Installation and Use

At the time of this incident, there was a longstanding precedent that a person traveling on public thoroughfares had no reasonable expectation of privacy in his movements from one place to another, even if "scientific enhancements" allow police to observe this public information

more efficiently. *United States v. Knotts,* 460 U.S. 276, 282-284 (1983); *see also Stone*, 941 A.2d at 1249-51.  The Supreme Court  held that a "search" within the meaning of the Fourth Amendment occurred only where a "legitimate expectation of privacy * * * has been invaded by government action." *Knotts*, 460 U.S. at 280 (internal quotation marks omitted). As a result, "[w]hat a person knowingly exposes to the public * * * is not a subject of Fourth Amendment protection." *Katz* v. *United States*, 389 U.S. 347, 351 (1967). Applying those principles in *Knotts*, the Court held that a person "traveling in an automobile on public thoroughfares had no reasonable expectation of privacy in his movements from one place to another." 460 U.S. at 281.

In *Knotts*, police officers, without obtaining a warrant, installed an electronic beeper in a container of chemicals that was subsequently transported in a vehicle. 460 U.S. at 277. The police officers used the beeper to supplement their visual surveillance of the vehicle, and the Court stated that "[n]othing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case." *Id* . at 282.

As in *Knotts*, at the time of the incident, Blue had "no reasonable expectation of privacy in his movements from one place to another" as he traveled on public roads, 460 U.S. at 281, because those movements were all in public view. The enhanced accuracy of GPS technology, compared to the beeper used in *Knotts*, does not change the analysis. See *id.* at 284 ("Insofar as respondent's complaint appears to be * * * that scientific devices such as the beeper enabled the police to be more effective in detecting crime, it simply has no constitutional foundation."); *Smith v. Maryland*, 442 U.S. 735, 744-745 (1979) (noting that petitioner had conceded that he would have no reasonable expectation of privacy in the phone numbers he dialed if he had

placed the calls through an operator, and stating that "[w]e are not inclined to hold that a different constitutional result is required because the telephone company has decided to automate"). Electronic tracking of a vehicle as it moves on public roads offends no reasonable expectation of privacy because it reveals only information that any member of the public could have seen, and it is therefore not a search within the meaning of the Fourth Amendment. See, *Katz* at 351.

Furthermore, even if the holding of *Knotts* was limited to police monitoring of short journeys on public roads with the assistance of electronic surveillance, the Court applied the same Fourth Amendment principles to prolonged electronic tracking in *United States* v. *Karo*, 468 U.S. 705, 715 (1984). In *Karo*, agents placed a tracking device in a can of ether and left the device in place for five months as the can was transported between different locations. *Id.* at 709-710. The Court held that certain transmissions from the beeper during that prolonged period—*i.e.*, those that revealed information about private spaces—could not be used to establish probable cause in an application for a warrant to search a residence, but the Court's holding on that point did not depend upon the duration of the electronic monitoring. *Id.* at 714-718. The Court expressed no concern about the prolonged monitoring. The GPS monitoring in this case was not "dragnet" surveillance, which the Court in *Knotts* stated it would leave for another day. 460 U.S. at 284. The Court generally has used the term "dragnet" to refer to high-volume searches that are often conducted without any articulable suspicion. *See*, *e.g.*, *Florida* v. *Bostick*, 501 U.S. 429, 441 (1991); *Cupp* v. *Murphy*, 412 U.S. 291, 294 (1973) (discussing police "dragnet" procedures without probable cause in *Davis* v. *Mississippi*, 394 U.S. 721 (1969)); *Berger* v. *New York*, 388 U.S. 41, 65 (1967). That scenario is not presented here. The agents in

this case tracked the movements of a single vehicle driven by an individual which they had observed participate in a hand-to-hand drug transaction. Even if this were (incorrectly) deemed a Fourth Amendment search, it would be a reasonable one. The facts raise no concerns about mass, suspicionless GPS monitoring; "the fact is that the 'reality hardly suggests abuse.'" *Knotts*, 460 U.S. at 283-284 (quoting *Zurcher* v. *Stanford Daily*, 436 U.S. 547, 566 (1978)). Such was the state of the law at the time of the GPS use in this case.

### 3.        *United States v. Jones*

The Supreme Court in *Jones* held that the government's installation of a GPS device on a target's vehicle and its use of that device to monitor the vehicle's movements, constituted a "search." *Jones,* 132 S. Ct. at 949. The Fourth Amendment provides in relevant part that "the right of the people to be secure in their persons, houses, papers, and effects. *Id.* The Court found that a vehicle is an "effect" as that term is used in the Amendment. *Id.* The Court, in responding to the government's argument that there was no expectation of privacy in the area of Jones's Jeep accessed by government agents and in the locations of the Jeep on public roads, stated that Jones's Fourth Amendment rights did not rise or fall with the *Katz* (expectation of privacy) formulation, that the Court must assure preservation of that degree of privacy (common law trespass) that existed when the Fourth Amendment was adopted. *Jones,* at 950.

The Court stated that the existence of a common-law trespass is not the "exclusive test" for whether a government  intrusion amounts to a Fourth Amendment search and that situations in which there is no trespass would remain subject to *Katz's*  reasonable expectation of privacy standard. *Jones,* at 953-54.   The majority opinion in *Jones* did not decide whether the government's use of GPS monitoring was a Fourth Amendment search under the *Katz* test.

*Jones,* at 950. The concurring opinions made clear that five Justices agreed that "longer term GPS monitoring" impinges on a reasonable expectation of privacy. *Jones,* at 955 (Sotomayer, J. concurring); *Jones*, at 964 (Alito, J. concurring in the judgment). In the present case, the GPS tracking device was used on one day - July 13, 2011.

### 4. The Use Of The GPS Did Not Affect Probable Cause

Based on the hand-to-hand drug transaction between Blue and Townsend on June 29, 2011, BPD detectives had probable cause to arrest Blue. In addition, probable cause would have also existed to obtain a search warrant Blue's residence and/or stash house if detectives would have known the location of Blue's stash house and residence. The testimony of detectives would be that, regardless of the GPS use, they would have followed Blue until they learned of the locations of his stash house and residence.

It is the Government's position that use of the GPS did not change what the detectives intended to do and would have done without the use of a GPS tracker on July13, 2011. While the government clearly acknowledges the detectives' use of a GPS tracker to follow Blue on July 13, 2011, detectives will testify that the GPS did not change their plans and Blue would have been followed until such time that the locations of his residence and stash house were revealed. Indeed, under the "inevitable discovery" doctrine, improperly seized evidence may be admitted if the Government can establish by a preponderance of the evidence that the information sought would have been ultimately or inevitably discovered by lawful means. *See Nix v.* Williams, 467 U.S. 431, 444 (1984); United *States v. Mobley*, 40 F.3d 688, 693 (4th Cir. 1994).

The Government's first argument is that the use of a GPS tracker was not so intricately intertwined with the probable cause to arrest Blue on July 13, 2011, and to obtain the search

warrants for his residence and stash house. Even though a GPS tracker was used by the detectives, if the use was excised, there would still be sufficient probable cause for the arrest of Blue and the search of his residence and stash house. By analogy, when tainted evidence is used to obtain a search warrant, the search warrant will not be invalidated so long as there is enough untainted information to support probable cause. *See, e.g., United States v. Wright,* 991 F.2d 1182 (4th Cir. 1993)(the inclusion of tainted evidence does not invalidate a search warrant if enough untainted evidence supports the warrant); *United States v. Gillenwaters,* 890 F.2d 679 (4th Cir. 1989)(where a warrant affidavit contains information obtained in an illegal search, the inclusion of the tainted does not invalidate the warrant when the affidavit's other averments set forth probable cause); *United States v. Whitehorn,* 813 F.2d 646, 649 (4th Cir. 1987)(inclusion in application for search warrant of information found pursuant to illegal entry did not invalidate the warrant). Also, omission of immaterial information from an affidavit does not invalidate a search warrant, so long as the information was included still establishes probable cause. *United States v. Gary*, 528 F.3d 324, 327-28 (4th Cir. 2008). Even if the GPS information was excised from the probable cause, detectives would have followed Blue until the locations of his residence and stash house were revealed. The result would have provided probable cause to search the locations regardless of the use of the GPS tracker.

### 5.    The Detectives Acted in Good Faith

The purpose of the exclusionary rule is to deter future Fourth Amendment violations, not to remedy past ones. *Davis v. United States,* 131 S.Ct. 2419, 2426 (2011). The Supreme Court has emphasized that "the exclusionary rule is not an individual right and applies only whether it 'results in appreciable deterrence". *Herring v. United States,* 555 U.S. 135, 141 (2009) (*quoting*

21

*United States v. Leon,* 468 U.S. 897, 909 (1984). Because suppression imposes a "costly toll upon truth-seeking and law enforcement objectives" by "letting guilty and possibly dangerous defendants go free", a court must find that the benefits of deterrence outweigh the costs before excluding evidence obtained in violation of the Fourth Amendment. *Ibid.(quotation marks omitted); Davis*, at 2427,("For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs. Our cases hold that society must swallow this bitter pill when necessary, but only as a last resort.).

To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. *Herring*, at 144. Suppression may therefore be warranted to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence. *Id.* But when the police act with an objectively reasonable good-faith belief that their conduct is lawful or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force and exclusion cannot pay its way. *Davis,* at 2427-28.

At the time of the installation and use of the GPS in this case, there was no legal precedent that precluded the investigators from the warrantless use of a tracking device. Because this case initiated as a state level investigation until its referral to the United States Attorney's Office in late July 2011, binding state law precedent specifically authorized detectives to utilize warrantless GPS tracking devices. Moreover, Courts of Appeal (with the exception of the D.C. Circuit in *Jones* below) had relied on *Knotts* to conclude that police did not need to obtain a warrant to install a tracking device on the exterior of a vehicle or to monitor the movement of that vehicle on public roads. The Supreme Court has repeatedly held that a police

officer is entitled to rely on factual and legal decisions by courts and should not be penalized if those decisions are later found to be incorrect. *See, e.g. Leon,* at 920-21; *Massachusetts v. Shepard*, 468 U.S. 981, 987-88 (1984); *Herring,* at 147-48. In fact, in a Fifth Circuit case, the court specifically rejected reliance on trespass law as a measure of the alleged Fourth Amendment violation. *United States v. Michael*, 645 F.2d 252, 258 (5th Cir. 1981).

In the present case, the police officers acted reasonably and in good faith in collecting GPS tracking information without a warrant and that suppression of the information is therefore unjustified. *Davis,* 131 S. Ct. 2419*; Herring,* 555 U.S. 135. Since the issuance of the *Jones* decision, several courts have concluded that the good faith exception is applicable to pre-Jones use of GPS trackers. *See United States v. Amaya*, — F. Supp. 2d —, 2012 WL 1188456, *4-8 (N.D. Iowa 2012), *reversed in part on other grounds*, — F. Supp. 2s —, 2012 WL 1523045 (N.D. Iowa 2012)(evidence collected from GPS devices is not subject to exclusionary rule because good faith exception is applicable); *United States v. Leon*, 2012 WL 1081962, *5 (D. Hawaii 2012)(applying good faith exception to pre-*Jones* use of GPS tracker); *United States v. Luna-Santillanes*, 2012 WL 1019601, *9 fn. 5 (E. D. Mich. 2012)(finding government's argument that the good faith exception should be applied to pre-*Jones* use of GPS trackers "persuasive"); *United States v. Hanna*, 2012 WL 769746, *2-4 (C. D. Cal. 2012)(exclusionary rule does not apply to use of GPS trackers in light of *Davis* case). Moreover, in *United States v. Stephens*, criminal no. JKB-11-0447, the Honorable James K. Bredar rendered recently an oral decision, holding the exclusionary rule invalid to pre-*Jones* use of GPS trackers in the District of

Maryland based on the good faith exception as explained in *Davis*.[4] Accordingly, the good faith exception should be applied in this case.

### e.      Blue Is Not Entitled To A *Franks* Hearing

In his Motion to Suppress Tangible and Derivative Evidence (docket no. 19), Blue requests a Franks hearing based on his assertion that "the affiant may have made numerous material omissions and misstatements in the application for a search warrant." *See* Motion to Suppress Tangible and Derivative Evidence (docket no. 19) at 10-11. Specifically, Blue takes issue with the following omissions and/or misstatements: (1) the police observed the drug transaction between Blue and Townsend via a pole camera video and the video does not show what Blue handed Townsend; (2) the affiant omitted the use of GPS tracking on locating Blue; (3) omitted the fact that Blue never received any money from Townsend prior to their drug transaction; (4) that police never recovered any narcotics from Holt at the time Holt was arrested. See Motion (docket no. 19) at 10-11. As discussed more fully below, Blue's arguments are without merit and his request for a *Franks* hearing should be denied.

"[A] hearing on a motion to test the sufficiency of the affidavit is required only if the defendant 'makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.'" *United States v. McCoy*, 513 F.3d 405, 409 n.2 (4th Cir. 2008) (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).

In *Franks*, the United States Supreme Court recognized a strong presumption of validity

---

[4] A transcript from the motions hearing in the Stephens case was ordered and will be offered at the motions hearing in this case on May 30, 2011.

with respect to an affidavit supporting a search warrant. 438 U.S. at 171-72. The Court, therefore, held that a hearing on a motion to test the sufficiency of a warrant is required *only* in a case where a substantial preliminary showing is made by the defendant that the affidavit contained knowing and intentional falsehoods or omissions which, if corrected, would have caused the issuing judge not to authorize the search. *Id.* When, as here, a defendant bases his request for a *Franks* hearing on alleged omissions, rather than a "false affirmative statement," his burden increases. *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008). Moreover, a defendant's allegations that an affidavit contains intentional falsehoods or omissions "must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171; *see also United States v. Shorter*, 328 F.3d 167, 170 (4th Cir. 2003).

A hearing to test the sufficiency of the subject search warrant is not necessary because Blue failed to offer any credible information that demonstrates that the affidavit contained knowing and intentional falsehoods or omissions. Blue argues that the police observed the hand-to-hand drug transaction between Blue and Townsend via pole camera video. This assertion is contrary to the facts presented. Detectives observed the hand-to-hand with their own eyes, and the transaction is corroborated by the pole camera video. In addition, the fact the affidavit does not mention that detectives utilized a GPS tracker to located Blue is not a material omission and plays no role in the probable cause determination. Blue also takes issue with the fact that the affiant did not include in the affidavit that Blue never received any money prior to the drug transaction between Blue and Townsend. Again, this information is not a material omission and would have no bearing on whether probable cause existed to issue the warrant. As indicated in the warrant, Blue and Townsend met on N. Curley Street and detectives observed Blue hand

Townsend an object, which Townsend placed in his left front pants pocket. Within a few minutes after the transaction, Townsend was arrested as he attempted to enter his residence. The only item recovered from Townsend's left front pants pocket was a piece of bread with heroin inside. Thus, the fact that no money was exchanged is not relevant to the probable cause analysis. Finally, Blue takes issue with the fact that the affidavit does not include the fact that no narcotics were recovered from Holt at the time of his arrest. Blue's assertion ignores the sequence of events involving Holt and fails to consider that Holt forced his way out of a police blockade and left his vehicle in the 1200 block of Chase Street. Obviously, if Holt did have illegal narcotics on him at the time that police attempted to stop him on July 13, 2011, he would have had ample time to dispose of or stash the narcotics prior to his arrest that occurred after Holt arrived at a hospital with a complaint of gunshot wounds.

Blue offers nothing more than unsupported claims of irrelevant omissions and/or alelged misstatements that have no bearing on whether the search warrant was supported by probable cause. Moreover, Blue has failed to offer any proof that the affidavit is materially deficient in any way and, therefore, Blue has not met his burden to show that he is entitled to a hearing to test the sufficiency of the search warrant. Accordingly, his request for a *Franks* hearing should be denied.

**C.** **Defendant Blue Was Properly Advised Of The *Miranda* Rights And Voluntarily Waived Them Prior To Making Statements**

On July 13, 2011, after his arrest, Blue made statements to Baltimore City Police Department detectives. At the time that Blue provided his statements, he was well aware of the *Miranda* rights and waived those rights voluntarily. *See Miranda v. Arizona*, 384 U.S. 436, 475 (1966)(a suspect may waive his rights as long as he does so voluntarily, knowingly, and

intelligently).

Prior to their interview, Blue was read the *Miranda* rights and agreed to waive those rights and speak with police.  During his interview, Blue admitted that he had met with Holt to discuss a drug transaction, but denied being at 7 Rosecrans Place earlier that day, and denied that he had exited from the residence located at 4913 Sinclair Lane.

The statements made by defendant Blue should be admitted because the statements were made voluntarily.  *See Dickerson v. United States*, 530 U.S. 428, 444 (2000)(admissibility of a defendant's statement turns on whether it was made voluntarily, as required by the Fifth Amendment).  Blue was properly advised of and waived the *Miranda* rights prior to providing any statements.  Second, prior to Blue making his statements no law enforcement agent indicated that their statements would in any way be immunized.  By the same token, law enforcement agents did not engage in any violence or threats in order to persuade Blue to make a statement. *See United States v. Braxton*, 112 F.3d 777, 784 (4th Cir. 1997).

Blue's was short in duration and he was not threatened or made any promises during the interview.   Based on these facts,  the police did not engage in any coercive activity against the defendants.  *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986)("coercive police activity is a necessary predicate" to any finding that a confession was not "voluntary" within the meaning of the Due Process Clause).

Thus, under the totality of the circumstances, the will of the defendant was  not "overborne" and their "capacity for self-determination" was not "critically impaired."  *See Gray*, 137 F.3d at 771 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973)); *see also Mincey v. Arizona*, 437 U.S. 385, 399 (1978); *Haynes v. Washington*, 373 U.S. 503, 513 (1963).

Accordingly, defendant Blue's statements were made voluntarily and should not be suppressed.

**D.      Blue's Request For Disclosure Of The Confidential Source**

Blue has filed a motion for disclosure of the confidential informant. *See* Motion for Disclosure of Confidential Informant (docket no. 16). As discussed more fully above, a confidential source/cooperating witness participated in a drug transaction with Keith Townsend. Townsend then obtained illegal narcotics from Blue, with the intent of selling the narcotics to the confidential source. If the case proceeds to trial, the Government will likely call the confidential source to testify. Pursuant to the written discovery agreement in the case, the Government will provide the identity of the witness and related documents one week prior to trial.

**E.      The Counts In The Indictment Should Not Be Severed**

Fed. R. Crim. P. 8(a) provides that two or more offenses may be charged in the same indictment when the offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Because of the prospect of duplicating witness testimony, impaneling additional jurors or wasting limited judicial resources, joinder is the rule rather than the exception. *United States v. Hawkins,* 589 F.3d 694, 700 (4th Cir. 2009). Where offenses are properly joined under Rule 8(a), severance of the offenses is rare. *United States v. Cardwell*, 433 F.3d 378, 387 (4th Cir. 2005).

In this case, Blue is charged in Count One with conspiracy to distribute and possess with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. § 846, and two counts of possession with intent to distribute heroin in violation of 21 U.S.C. § 841. All three counts charge similar conduct and the events charged occurred two weeks apart. For these reasons, the counts are joined properly and Blue has not offered any legitimate showing of how he would be

prejudiced if the counts proceeded jointly in a single trial.

## IV. CONCLUSION

For all of the foregoing reasons, and for the reasons to be presented at an evidentiary

hearing on this matter, the defendant's Motion to Suppress should be denied.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney


Date:   May 10, 2012     By:_____/s/_____

John W. Sippel, Jr.
Assistant United States Attorney
36 S. Charles Street, Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800
(410) 962-3124 facsimile


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the   10th   day of May, 2012, a copy of the foregoing

Government's Response to Defendant's Pretrial Motions was served via ECF to all counsel of

record.

_____/s/_____

John W. Sippel, Jr.
Assistant United States Attorney