# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES | * | |
| v. | * | Crim. No. ELH-11-0508 |
| DANIEL BLUE | * | |
|  | * | |

* * * * * * * * * * * * * *

## DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS MOTION FOR A NEW TRIAL

Daniel Blue, by and through his attorneys, James Wyda, Federal Public Defender for the District of Maryland, Katherine Tang Newberger, Assistant Federal Public Defender, and Sapna Mirchandani, Appellate Attorney, hereby submits this reply to the government's response in opposition to his motion for a new trial based on newly discovered evidence.

## I.    BACKGROUND

### A.    Sergeant Marinos Gialamas's Criminal Conviction

#### 1.    The October 27, 2011, Assault of Antoine Green

A jury convicted Sergeant Marinos Gialamas of one count of official misconduct for his role in the assault of Antoine D. Green on October 27, 2011.  *State of Maryland v. Marinos Gialamas*, Md. Circ. Ct. Case No. 212292001, Docket (attached as Exhibit A).  The State's Attorney for Baltimore City presented the following evidence in support of the conviction:

> Sgt. Gialamas, a Baltimore City Police Department Sergeant in the Violen[t] Crime Impact Section ("VCIS"), was on patrol with two of his Detectives in the Eastern District when they witnessed a suspected drug transaction.  When Sgt. Gialamas and the Detectives pulled up in their unmarked vehicle, the suspected dealer tossed the narcotics and fled on foot; and Sgt. Gialamas drove off in the vehicle in search of the suspect.  Following a call over the radio, other officers became involved in the search, which ultimately focused on the rear alley of

the 2200 [b]lock of Prentiss Place. The search proved unsuccessful until another call over the radio reported a breaking and entering at 2236 Prentiss Place. Officers immediately responded to that location, entered the residence, and arrested the suspect, Mr. Antoine Green ("Mr. Green"). At some point, Sgt. Gialamas and his Detectives arrived and took over responsibility for the scene, including custody of a handcuffed Mr. Green. Sgt. Gialamas was at that point, and all subsequent times, the highest ranking officer and Sergeant in Charge.

At some point, a police transport vehicle ("the wagon") arrived to Prentiss Place. The wagon driver entered the residence and eventually took Mr. Green to the wagon, securing him in the rear of the vehicle. Following protocol, the wagon driver then began to drive away to take Mr. Green to Eastern District, and ultimately to Central Booking.

Back at the residence, a series of events had begun to unfold. Of particular note was the arrival of Officer Anthony Williams. Officer Williams was at that time engaged in a personal and romantic relationship with the resident of 2236 Prentiss Place, Ms. Nakshia Epps, and she had contacted him after Mr. Green broke into her house. Testimony at trial established that Officer Williams and Sgt. Gialamas had a conversation, during which Sgt. Gialamas told Officer Williams that he would "take care of it." Immediately following the conversation, Sgt. Gialamas called over the radio for the wagon to, "10-6," which is the police signal for "Stand-By." In response to this signal, the wagon driver stopped driving out of the block and returned to 2236 Prentiss Place.

At this point, Sgt. Gialamas exited the residence and instructed the wagon driver to get Mr. Green out of the wagon and back into the house. Sgt. Gialamas told the wagon driver that he wanted Mr. Green back into the house so that pictures could be taken. Sgt. Gialamas told another Detective that he wanted to trade out his metal handcuffs for plastic flexcuffs. Sgt. Gialamas testified at trial that he brought Mr. Green back into the house for the purposes of having Ms. Epps make a pre-trial identification.

No photos were taken. No handcuffs were exchanged. No identification was made.

By this time, a crowd of citizens had formed. When Mr. Green was taken out of the wagon and back into the house, the crowd was upset. Mr. Green, too, was upset. He resisted being brought back into the house, and screamed out to the crowd. When he reached the front steps, he grabbed the railing of the stoop. Eventually, with the assistance of multiple officers, Mr. Green was brought back into the house.

At this point, Sgt. Gialamas took Mr. Green to the rear of the home, where Officer Williams was waiting. The other officers stood in the vestibule, and heard a loud thump, like a body falling to the floor. Mr. Green was then heard to shout, "Y'all f----- up, y'all f----- up," and a loud verbal exchange ensued between Mr. Green and Officer Williams. Mr. Green testified that, while in the kitchen, Officer Williams and Sgt. Gialamas stomped him until Sgt. Gialamas said, "That's enough." Mr. Green was then brought back into the front of the house, and returned to the custody of the wagon driver, who took him to Eastern District and then Central Booking.

*State v. Gialamas*, State's Sent. Mem., at 2-4 (footnotes excluded) (attached as Exhibit B).

The State's evidence further established that when Mr. Green arrived at Central Booking, the medical staff refused to book him. They insisted that Mr. Green be taken to a hospital that night for medical treatment. *Id.* at 4 n.2.

Sergeant Gialamas was charged with four offenses: (i) second degree assault; (ii) misconduct in office by the commission of a wrongful and improper act; (iii) misconduct in office by the commission of a lawful act in a wrongful and improper manner; and (iv) misconduct in office by the knowing and corrupt failure to do an act required by the duties of the office. *See State v. Gialamas*, Criminal Information (attached as Exhibit C). Following a week-long trial, the jury acquitted Sgt. Gialamas of the first two counts, failed to reach a unanimous verdict on the third count, and returned a guilty verdict on the fourth count.[1] The state requested a two-year sentence, with all but 60 days

---

[1] The state entered a *nolle prosequi* for the third count. State's Sent. Mem. (Ex. B), at 1.

suspended. State's Sent. Mem. (Ex. B), at 4-5 (stating that Sgt. Gialamas had "strayed far outside the boundaries of legitimate police power, and used his status in a manner that violated the public's trust and dishonored the badge of the Baltimore Police Department."). The court sentenced Sergeant Gialamas to six months imprisonment all suspended, one year of probation, and 250 hours of community service. He is appealing the conviction. *See* Docket (Ex. A), at 5.

Sergeant Gialamas's co-defendant, Officer Anthony Williams, was charged with two offenses: (i) second degree assault; and (ii) hindering and obstructing a police officer in the performance of her lawful duties. *See State of Maryland v. Anthony Williams*, Md. Circ. Ct. Case Nos. 212292002 and 212292003, Criminal Information (attached as Exhibit D). The jury found Officer Williams guilty of both offenses. The court sentenced him to one year imprisonment with all but 45 days suspended, 18 months of probation, and 200 hours of community service. *State v. Williams*, Commitment Record (attached as Exhibit E).

## 2.    Sergeant Gialamas's Testimony

Sergeant Gialamas testified in his own defense at trial. *State v. Gialamas*, Trial Trans., Vol. IV (attached as Exhibit F). He told jurors that he ordered the police wagon to return Mr. Green to the Epps home that night because he wanted to make a positive identification. *Id.* at 277-82. According to the sergeant, Mr. Green was brought into the house and Ms. Epps identified him as the intruder. *Id.* at 286-87. Afterward, Sergeant Gialamas testified, Mr. Green (who was in handcuffs and being held by the sergeant) and Officer Williams, who was in the kitchen, began yelling at each other. *Id.* at 289. Sergeant Gialamas described their subsequent encounter as follows:

As Officer Williams was approaching us, Mr. Green was a lot bigger than me. Mr. Green was, kind of, like, pulling me a little bit towards the kitchen, because they were yelling at each other. Officer Williams had let go of the back kitchen door. . . [which] fell onto a chair. . . .

As Officer Williams was coming towards us, Mr. Green was pulling me toward Officer Williams. We spun around a little bit; and, as we're spinning around, Mr. Green had gone down to the ground. . . He went down to his, like, knees area; to his - - to his shin. . . .

He started kicking around. Officer Williams was the closest one. Detective Tiedemann was walking towards me. Officer Williams had tried to help me assist getting Mr. Green under control.

*Id.* at 290-91.

Sergeant Gialamas testified that he did not strike Mr. Green with his hands or feet. *Id.* at 315. He also testified that Officer Williams did not strike Mr. Green. *Id.* at 290.

According to the sergeant, when Mr. Green was removed from the house for a second time, he did not appear to have any physical injuries. *Id.* at 292. The sergeant admitted that the incident report memorializing Mr. Green's arrest, which had been reviewed by him, omitted the fact that the medical staff at Central Booking had refused to process Mr. Green that night because they insisted that he receive medical treatment at a hospital. *Id.* at 320-21.

### B.    Daniel Blue's Trial and Conviction

In the summer of 2012, nearly a year after the assault on Antoine Green, Mr. Blue stood trial in the instant case. (At the time of Mr. Blue's trial, the State's Attorney's investigation into the assault on Mr. Green was well underway. *See* Govt. Br., Ex. 2).

Mr. Blue was charged with three drug offenses that were alleged to have taken place on two dates – June 29, 2011 (when Mr. Blue first came to the police's attention during their surveillance

of a third party) and July 13, 2011 (when Mr. Blue was arrested for the conduct observed two weeks earlier). Following a jury trial, Mr. Blue was convicted of conspiracy to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. § 846 (count one) and possession with intent to distribute heroin in violation of 21 U.S.C. § 841 (count three). He was acquitted of the offense charged in count two, possession with intent to distribute heroin in violation of 21 U.S.C. § 841. The court sentenced Mr. Blue to 120 months' imprisonment, the mandatory-minimum term.

### 1. Daniel Blue's Pre-Trial Motion to Suppress Evidence

#### a. *The only evidence establishing that Mr. Blue handed a "brownish" item to Mr. Townsend on June 29th was the testimony of Sergeant Gialamas*

Prior to trial, Mr. Blue moved to suppress the testimonial and physical evidence that officers recovered on July 13th on the ground that it was the fruit of an illegal arrest.[2] At a hearing on the motion, the government presented the testimony of three officers involved in the June 29th surveillance – Sergeant Gialamas, Task Force Officer William Bearde, and Detective James McShane. *See United States v. Blue*, Crim. No. 11-0508, Docket No. 119. Sergeant Gialamas and TFO Bearde testified that they had been parked in an unmarked police car across the street from the home of Keith Townsend, the target of their surveillance, on North Curley Street in Baltimore. A confidential informant placed a call to Mr. Townsend seeking drugs. Shortly thereafter, both officers observed a Lexus SUV drive up to Mr. Townsend's house. Then, they observed Mr. Townsend approach the vehicle and talk briefly with the driver. *Id.* at 12-14. After the SUV drove away, both

---

[2] The motion sought to suppress the following evidence: (i) statements made by Mr. Blue to TFO Bearde immediately following his arrest; (ii) the key recovered from Mr. Blue's pocket during a search incident to arrest; and (iii) heroin found in a footstool, which officers recovered during execution of a search warrant at the apartment for which Mr. Blue had possessed the key. *See United States v. Blue*, Dist. Ct. No. 11-0508, Docket Nos. 15, 19, 20.

officers observed Mr. Blue walking down the sidewalk toward Mr. Townsend. *Id.* at 16, 19.

Sergeant Gialamas alone testified that he saw a "brownish, tannish item" in Mr. Blue's hand. *Id.* at 16, 18, 39-40. He described Mr. Blue's hand as an "open fist" from which the item "protrud[ed] from [] both ends." *Id.* at 17. According to the sergeant, as Mr. Blue approached Mr. Townsend, the latter "reached out and received th[e] item from Mr. Blue" and put it into his left front pocket.[3] *Id.* at 18, 38-39. The sergeant testified that he had a "clear and unobstructed view" from approximately 30 yards away without the use of binoculars. *Id.* at 17-18, 40. In his opinion, he had witnessed a hand-to-hand transaction between Mr. Blue and Mr. Townsend. *Id.* at 46.

Apart from Sergeant Gialamas's testimony, no other evidence supported the allegation that Mr. Blue had been carrying a "brownish, tannish item" that he transferred to Mr. Townsend. TFO Bearde, who had been sitting next to Sergeant Gialamas in the unmarked car, testified that his view of the sidewalk was blocked by a vehicle parked directly in front of them. *Id.* at 55-57, 78 ("I did not see the transaction because of my view being obstructed, which Detective Sergeant Gialamas did observe."). And though other officers were present during the June 29th surveillance, they did not see the interaction between Mr. Blue and Mr. Townsend.

Notably, the police report memorializing the June 29th surveillance – which was prepared by TFO Bearde and reviewed by Sgt. Gialamas – did not include the latter's observation that Mr. Blue had been carrying an item in his hand as he approached Mr. Townsend. *See* Docket No. 92, at 67-68, 75. Additionally, though the interaction between Mr. Blue and Mr. Townsend had been recorded by a nearby surveillance camera, the video did not support the claim that Mr. Blue handed

---

[3] Mr. Townsend was subsequently arrested and found to have heroin wrapped between two slices of bread in his pocket. *Id.* at 21.

an object to Mr. Townsend. Docket No. 119, at 41, 136-37. The government played the video several times in court – and even slowed the video down "almost frame by frame" so that Mr. Blue's hand could be closely examined – but to no avail. The court concluded that the video simply was "not probative" of whether an item passed between the two men. *Id.* at 139 ("I can't say from looking at that that Mr. Blue had anything in his [] left hand. I can say he had something in his right hand, and it looked like a cell phone. It isn't that it rules it out, it just doesn't rule it in . . .").

The government eventually conceded that the only direct evidence establishing that on June 29th, Mr. Blue transferred an item to Mr. Townsend (presumably, the heroin wrapped in bread subsequently found in his pocket) was the testimony of Sergeant Gialamas. The government, echoing the court's sentiment that the video was of limited value because it did not show an item in Mr. Blue's hand, focused squarely on the testimony of Sergeant Gialamas: "*[T]hat's why we're relying on the visual observation versus the video.*" *Id.* at 137 (emphasis supplied).

> **b.** **Mr. Blue's arrest on July 13th was based on Sergeant Gialamas's claim that he engaged in a hand-to-hand transaction with Mr. Townsend on June 29th**

Two weeks after the officers' June 29th surveillance, they continued their investigation of Mr. Blue. On July 13th, TFO Bearde, Detective McShane, and Detective Crystal attached a slap-on global positioning system ("GPS") unit to Mr. Blue's car. *Id.* at 62-64. They followed Mr. Blue as he visited an apartment complex on Rosecrans Place, from which he left holding a small plastic container. *Id.* at 65-66, 131. Then they followed Mr. Blue as he drove to Lake Montebello. There, they observed Mr. Blue exit his car and speak to Jamar Holt (without any item in his hands) before the two men drove around the lake in Mr. Holt's car. *Id.* at 66-67, 131-32. After a failed attempt to stop Mr. Holt, which resulted in the officers firing at him multiple times as he fled, a decision was

made to arrest Mr. Blue. *Id.* at 67-70. In the officers' view, they had probable cause to arrest Mr. Blue without a warrant based on Sergeant Gialamas's witnessing of a hand-to-hand transaction two weeks earlier. *Id.* at 68 (testimony by TFO Bearde: "We felt we had probable cause due to the hand-to-hand transaction that Detective Sergeant Gialamas observed . . . [o]n June 29th."); *see id.* at 70, 89, 92.

During a search of Mr. Blue incident to arrest, officers recovered a key from his pocket. *Id.* at 74. Sergeant Gialamas took the key to the Rosecrans apartment complex, where Mr. Blue had been seen earlier that day. Sergeant Gialamas went door to door testing the key, discovering that it opened the front door to Apartment 1-D. *Id.* Officers entered the apartment, where they found Brandon Cooper (one of the apartment's two residents) asleep in a bedroom. Officers secured the apartment pending receipt of a search and seizure warrant. *Id.* Pursuant to the search, officers recovered approximately 120 grams of heroin in a footstool of the bedroom belonging to Tiffany Elliott, who resided in the apartment with Mr. Cooper. The drugs found in Ms. Elliott's bedroom formed the basis of the charges in count one (conspiracy to distribute heroin) and count three (possession with intent to distribute heroin) of which Mr. Blue was convicted.

    **c.**     ***The court's denial of the suppression motion rested primarily on Sergeant Gialamas's "credible" testimony that Mr. Blue had engaged in a drug transaction on June 29th***

The government argued that the court should deny Mr. Blue's suppression motion because his warrantless arrest on July 13th was justified by probable cause to believe he had committed a crime two weeks earlier. After summarizing for the court the officers' June 29th surveillance outside Mr. Townsend's home, the government stated:

> [B]ased on that set of facts alone, based on Sergeant Gialamas's knowledge and experience and training, that is sufficient probable cause to arrest Daniel Blue right there on the spot. . . . [T]hat's on June 29th, 2011.  Probable cause doesn't go stale.  It doesn't expire at midnight on June 29th, 2011.  It carries over.

*Id.* at 142.  In the government's view, the nexus between the June 29th surveillance and the discovery of drugs in the Rosecrans apartment on July 13th was obvious:  "*So, clearly, based on what [officers] observed on June 29th, that incident alone, they had probable cause.  That's why they arrest [Mr. Blue].  They search him.  They find the keys.*"  *Id.* at 146.

The defense urged the court to suppress the evidence because Sergeant Gialamas's alleged witnessing of a hand-to-hand transaction was suspect.  Defense counsel stated:

> Certainly, the Court has had an opportunity to observe the testimony of Sergeant Gialamas and to gauge its veracity and credibility. . . According to his testimony, he was approximately 30 yards, 90 feet, away from Mr. Blue. . . .  I am going to ask the Court to give very hard consideration to whether or not Sergeant Gialamas could, in fact, have made the observations he made that he testified to.  There were several moments in his testimony where he could not remember facts that otherwise would seem to be readily available to him . . . .  Detective Bearde also testified that even though he was seated right next to Sergeant Gialamas, he was not able to make those same observations.

*Id.* at 157.

After carefully weighing the evidence, the court ruled in favor of the government, finding that Mr. Blue's warrantless arrest on July 13th was justified by probable cause to believe he committed a crime on June 29th.  *Id.* at 200.  In the court's view, although Sergeant Gialamas's claim that he saw Mr. Blue hand an object to Mr. Townsend was uncorroborated, his testimony nonetheless satisfied the probable cause inquiry because it was both "credible" and "uncontradicted."  *Id.* at 195-96.  The court explained:

It was not entirely clear from the video that there was a hand-to-hand transaction between Mr. Blue and Mr. Townsend. In fact, I couldn't see that at all. But what I did see was immediately they appeared to touch hands. I couldn't see that Mr. Blue had anything in his hand that he gave to Mr. Townsend. But I did see, immediately following this encounter, that Mr. Townsend's hand went in his left front pants pocket. *Detective Gialamas testified that he had an unobstructed view. He must have been asked this question several times, at the very least. And he testified that he witnessed a hand-to-hand transaction. And I accept that testimony as credible testimony.* He didn't see such a transaction between Mr. Townsend and anyone in the Lexus. . . . He did, however, testify unequivocally that he witnessed this hand-to-hand transaction between Mr. Blue and Mr. Townsend. . . .

*After the police shooting, a decision was made to arrest Mr. Blue based on what the police, I say "police," I mean Sergeant Gialamas, personally observed on June 29 of 2011.* And that was what he described as a hand-to-hand drug transaction between Mr. Blue and Mr. Townsend.

*Id.* at 195 (emphasis supplied), 200.

2.      **The Motion for Judgment of Acquittal**

During Mr. Blue's jury trial, the government introduced testimonial and physical evidence that largely paralleled the evidence introduced at the suppression hearing. *See* Docket No. 92.[4] After the government rested, Mr. Blue moved the court for judgment of acquittal on all counts. *Id.* at 229-39. The court denied the motion as to count two (charging the June 29th conduct), but reserved ruling on counts one and three (charging the July 13th conduct). *Id.* at 254.

After the jury acquitted Mr. Blue of count two, the court reconsidered the Rule 29 motion

---

[4] The government presented the testimony of three additional witnesses at trial: (i) Herbert Fenner, the confidential informant who called Mr. Townsend on June 29th, *see id.* at 76-97; (ii) Detective Keith Kienle, who participated in the arrest of Mr. Townsend on June 29th and the search of Apt. 1-D on July 13th, *see id.* at 140-50; and (iii) Special Agent Todd Edwards, who testified as an expert in the manner and means of drug trafficking, *see id.* at 203-25.

on counts one and three. *See* Docket No. 115. The court described the motion as a "close" and "difficult" case, but ultimately denied acquittal on both counts. *Id.* at 45-46. In reaching its decision, the court repeated the sentiment, which it had relied upon to deny the suppression motion, that it considered Sergeant Gialamas's testimony that he saw a hand-to-hand transaction on June 29th to be credible. In fact, the court stated that despite the jury's decision to acquit Mr. Blue on count two, which the court found surprising, the evidence presented in support of that offense contributed to its finding that there was sufficient evidence to support the convictions on counts one and three. *See id.* at 3 ("I want to be sure we all agree that, in analyzing the matter, I can still consider the events that led to the charge for Count Two."); *id.* at 11 ("[N]otwithstanding the acquittal on Count Two, I can consider the events of June 29, 2011.").

## II. NEWLY DISCOVERED EVIDENCE CONCERNING SERGEANT GIALAMAS WARRANTS A NEW TRIAL AND SUPPRESSION HEARING UNDER RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

The government's opposition brief accurately lays out the standard governing motions for a new trial based on newly discovered evidence. *See* Fed. R. Crim. P. 33(a); Govt. Br. at 4. The government's brief also accurately states that a court's inquiry into whether a new trial is warranted is guided by the five factors outlined in *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993) (requiring that evidence be newly discovered, found through diligence, not merely cumulative or impeaching, material, and likely to result in acquittal).

The government concedes that Mr. Blue's motion satisfies the first and second *Custis* factors because the evidence is both newly discovered and the product of diligence. Govt. Br. at 4. For the reasons explained below, the motion also satisfies the last three *Custis* factors. The evidence concerning Sergeant Gialamas is not "merely" impeaching because he was the sole witness to the

alleged hand-to-hand transaction involving Mr. Blue on June 29th, which was essential to establishing probable cause for his arrest. The evidence is "material" because the testimonial and physical evidence underlying both of Mr. Blue's convictions flowed directly from his July 13th arrest – which, as the government insisted below, was justified by probable cause to believe Mr. Blue had committed a crime on June 29th. Finally, in light of the essential role that Sergeant Gialamas played in securing Mr. Blue's convictions – including the court's reliance on his testimony to deny Mr. Blue's motion to suppress and motion for judgment of acquittal – evidence undermining the sergeant's credibility probably would have resulted in suppression of the evidence or, alternatively, acquittal.

### A. Evidence of Sergeant Gialamas's Conviction and Apparent Perjury is Not "Merely" Impeaching

The government asks this court to deny Mr. Blue's motion by arguing that the newly discovered evidence of Sergeant Gialamas's misconduct conviction and possible perjury is "[no]thing more than impeachment evidence." Govt. Br. at 5. But, contrary to the government's suggestion, Rule 33 does not prohibit new trials based on newly discovered evidence that undermines a witness's credibility. *See United States v. Taglia*, 922 F.2d 413, 415 (7th Cir. 1991) (Posner, J.) ("Nothing in the text or history of Rule 33 . . . supports a categorical distinction between types of evidence; and we cannot see the sense of such a distinction.). Judge Posner noted in *Taglia* that the guiding principle of Rule 33 is the "interest of justice," not the type of evidence presented to a court. 922 F.2d at 415; Fed. R. Crim. P. 33 (providing that court may grant new trial "if the interest of justice so requires"). However, Judge Posner explained, in practice, it is not often the case that a post-conviction discovery of impeachment evidence warrants a new trial because "ordinarily

such evidence cast[s] doubt at most on the testimony of only one of the witnesses." 922 F.2d at 415.

The government's argument ignores the distinction that courts have drawn between newly discovered evidence that is "impeaching" and newly discovered evidence that is "merely impeaching."[5] *United States v. Quiles*, 618 F.3d 383, 393 (3d Cir. 2010) (discussing need to strike balance between "interest of justice" required by Rule 33 and finality). Whether evidence undermining the credibility of a prosecution witness is impeaching or "merely" impeaching depends on the quantum of evidence used to secure the conviction in the first place. *Id.* (describing inquiry as whether there is a strong exculpatory connection between the newly discovered evidence and the evidence presented at trial or whether the newly discovered evidence, though itself not exculpatory, throws severe doubt on the truthfulness of critical inculpatory evidence introduced at trial).

The Fourth Circuit's opinion in *United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010), aptly illustrates how to differentiate between the two kinds of impeachment evidence. The defendant in *Robinson* was convicted of twelve drug and firearm offenses following parallel investigations by two separate groups of law enforcement officers. State officers in the Criminal Investigation

---

[5] In a similar vein, the government appears to suggest that the proper test to apply to a Rule 33 motion based on impeachment evidence is whether the defendant was convicted on the testimony of a single witness who was "discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases." Govt. Br. at 5 (citing *Robinson*, 988 F.2d at 1359). This hypothetical, which originally appeared in *Taglia*, must be considered in the context in which it was made. The court explained in *Taglia* that it would be nonsensical to apply Rule 33 in a manner that reflexively bars retrial whenever newly discovered evidence undermines a trial witness. In an attempt to illustrate the absurdity of such a rule, the court described a hypothetical defendant whose conviction depended on the testimony of a single witness who was shown to have perjured himself in countless cases. Viewed in this context, the court was offering the "sole witness lied repeatedly" hypothetical as a clear example of a case where impeachment evidence necessarily would require a new trial. It was not intended to serve as a test for deciding whether newly discovered impeachment evidence should warrant retrial in other cases.

Division ("CID"), with assistance from the ATF, investigated a string of residential firearm burglaries involving the defendant. Separately, officers in the Narcotics Division ("ND") conducted their own investigation of drug dealing in and around the defendant's home. The CID officers and ATF agents executed federal search warrants that generated substantial incriminating evidence against the defendant; the ND officers executed a state search warrant that did the same. At trial, the government presented the physical evidence generated from the searches as well as testimony from CID officers, ATF agents, ND officers, and nineteen cooperating witnesses and co-defendants.

Following the defendant's conviction, he learned that some of the ND officers involved in his case had engaged in unrelated misconduct.[6] A subsequent investigation resulted in the termination or resignation of four of the officers. *Id.* at 945-46. (Prior thereto, none of the officers' files contained evidence of misconduct. *Id.*) The defendant moved for a new trial on all counts. Initially, the district court granted the defendant's motion, finding that the officers' misconduct "[went] to the integrity of the investigation." *Id.* at 948. Upon reconsideration, the court narrowed its holding to six of the twelve counts. It determined that the six counts of conviction based on evidence gathered by CID officers and ATF agents pursuant to the federal search warrants did not require retrial. However, the six counts of conviction based on evidence gathered by ND officers pursuant to the state search warrant did require retrial. The latter charges were eventually dismissed.

_____

[6] A report prepared by the South Carolina Law Enforcement Division detailed four instances of misconduct: (i) two officers used "buy money" to gain entrance to and buy alcoholic drinks at a club, then repaid the funds to the county prior to the monthly budget reconciliation; (ii) three officers used buy money to purchase drinks and pay dancers at a club, then repaid the funds to the county prior to the budget reconciliation; (iii) one officer improperly disposed of cocaine purchased by an informant after failing to log it; and (iv) four officers drank alcohol purchased in underage alcohol buys and, in some cases, took the purchased alcohol home without logging the evidence. *Id.* at 946-47.

On appeal, the Fourth Circuit affirmed the district court's ruling. In a published opinion, the court explained why the misconduct evidence was impeaching with respect to some counts of conviction, but "merely" impeaching with respect to other counts of conviction. In the court's view, evidence of the officers' misconduct could not be described as "merely" impeaching as to the dismissed counts because the discharged officers played an "integral" role in securing the convictions. However, with respect to the non-dismissed counts, the evidence was "merely" impeaching because the discharged officers' testimony had been "amply corroborated by [] other law enforcement officials and Robinson's associates." *Id.* at 949.

Against this backdrop, it is difficult to see how the newly discovered evidence presented by Mr. Blue here could be characterized as "merely" impeaching. The new evidence consists not only of Sergeant Gialamas's criminal conviction for official misconduct, but also his apparent perjury in describing under oath what happened on the night of Mr. Green's assault. While both types of evidence are impeaching because they undermine the sergeant's credibility, they are not "merely" impeaching because Sergeant Gialamas was the only person who claimed to have seen Mr. Blue engage in a hand-to-hand drug transaction with Mr. Townsend on June 29th. *See United States v. English*, 998 F.2d 609, 612 (8th Cir. 1993) ("Had [discredited officer] been the only witness to the incident, his subsequent guilty plea for misrepresenting drug quantities to a court might cast sufficient doubt upon the veracity of his testimony to warrant a new trial . . .").

Neither TFO Bearde, who was seated next to the sergeant, nor Mr. Fenner, who was seated behind him, testified that they were able to see Mr. Blue hand an object to Mr. Townsend. The incident report memorializing the June 29th surveillance, which was prepared by TFO Bearde and reviewed by Sergeant Gialamas, made no mention of a visible object being passed between the men.

And the surveillance video, taken from approximately the same distance away from Mr. Blue as Sergeant Gialamas had been, only showed Mr. Blue walking toward, and touching hands with, Mr. Townsend. The video did not show Mr. Blue holding a "brownish" object that "protrud[ed] from [] both ends" of his "open fist," as described by Sergeant Gialamas. Absent any evidence corroborating the sergeant's claim that the object (presumed to be heroin) was handed to Mr. Townsend, Sergeant Gialamas's testimony was essential; thus, challenges to his credibility cannot be viewed as "merely" impeaching.

This case bears little resemblance to those in which impeaching evidence did not warrant a new trial because in those cases, the defendant's conviction was secured by multiple eyewitnesses or unimpeachable physical evidence. *See*, *e.g.*, *Taglia*, 922 F.2d at 416 (evidence that witness previously testified falsely in unrelated matter was "merely" impeaching because "crucial evidence" implicating the defendants were tapes proving their commission of crimes, not testimony of discredited witness); *United States v. Davis*, 15 F.3d 526, 531-32 (6th Cir. 1994) (evidence of arresting officer's resignation from force following accusation that he planted drugs on suspect was "merely" impeaching because "[t]wo independent witnesses testified to seeing cocaine fall from [the defendant's] person, and [the defendant] himself admitted to having purchased crack cocaine"); *Quiles*, 618 F.3d at 391 (evidence of witness's conviction for committing sexual offense against minor was "merely" impeaching because witness's testimony was corroborated by two other witnesses and did not undermine essential evidence establishing defendant's guilt); *United States v. Thompson*, 335 Fed. Appx. 876 (11th Cir. 2009) (evidence of officer's involvement in corruption scandal was "merely" impeaching because disgraced officer's testimony was amply corroborated by officers not involved in scandal).

Notably, in cases where courts have held that newly discovered impeachment evidence did warrant a new trial, the amount of independent evidence establishing guilt was far greater than what was presented against Mr. Blue. For example, in *United States v. King*, 71 Fed. Appx. 192 (4th Cir. 2003), the defendant was convicted of participating in a drug conspiracy after a jury trial during which twenty-one prosecution witnesses testified. The Fourth Circuit found that a new trial was warranted by subsequently-discovered evidence that three of those witnesses (inmates who had cooperated with the government in exchange for leniency) may have testified falsely. Similarly, in *Robinson,* the defendant was convicted of drug and firearm offenses based on physical evidence (including recorded buys) and the testimony of numerous officers and 19 cooperating witnesses. The court found that a new trial was warranted by newly discovered evidence that *some* of the officers had engaged in official misconduct in an unrelated matter because those officers had been "integral" to the defendant's prosecution.

As these cases demonstrate, whether evidence is impeaching or "merely" impeaching depends both on the substance of the discredited witness's testimony and the existence of evidence corroborating the same. In this case, Sergeant Gialamas testified that he clearly saw Mr. Blue engage in a hand-to-hand drug transaction with Mr. Townsend on June 29, 2011. No other witness claimed to have seen an object pass between the two men. The incident report did not state that anyone, even Sergeant Gialamas, had seen an object pass between them. And the surveillance video did not substantiate the sergeant's claim. For these reasons, the evidence undermining Sergeant Gialamas's credibility cannot be characterized as "merely" impeaching.

## B. Evidence of Sergeant Gialamas's Conviction and Apparent Perjury Is "Material"

For many of the same reasons that the newly discovered evidence concerning Sergeant Gialamas was not merely impeaching, it also was material to Mr. Blue's convictions on counts one and three.

The government argues that Sergeant Gialamas's conviction is immaterial to Mr. Blue's convictions because the two matters are "unrelated."[7] Govt. Br. at 7. As support, the government cites to the Fourth Circuit's comment in *Robinson* that retrials based on unrelated misconduct evidence are improper because they risk "miniature credibility trials" and intrusions upon the evidentiary limits concerning "subsidiary issues." 627 F.3d at 949. But the government takes this quote out of context. In the section of the *Robinson* opinion from which the language was taken, the Fourth Circuit was explaining why, in Mr. Robinson's case, which involved separate federal and state investigations, evidence undermining the state officers' credibility was not material to the counts of conviction based on the federal investigation. It was not material, the court explained, because the district court had "sound[ly]" concluded that "the dismissed officers played only bit parts in the separate CID/ATF investigation." *Id.* at 950.

But earlier in the *Robinson* opinion, the Fourth Circuit had explained why the state officers' misconduct *was* material to the dismissed counts – despite the fact that the instances of the officers'

---

[7] The government also appears to seek safe harbor in the fact that "the entire investigation [of Mr. Blue] was led by TFO Bearde who was present during the June - July 2011 events and was responsible for recommending the case for federal prosecution." Govt. Br. at 6. But the fact that TFO Bearde directed the investigation has no bearing on the materiality of Sergeant Gialamas's testimony about the June 29th surveillance. In fact, TFO Bearde openly admitted that because he did not see Mr. Blue hand an item to Mr. Townsend, he was relying solely on Sergeant Gialamas's claim that it took place.

misconduct did not occur in the investigation of the defendant's case. The court stated: "Although none of [the officers'] misconduct related to Robinson's case, the dismissed officers were involved, in varying degrees, with each of the buys and associated searches" that resulted in evidence implicating the defendant. *Id.* at 947.

The newly discovered evidence concerning Sergeant Gialamas is material. His criminal conviction for official misconduct, standing alone, is sufficiently material to support a new trial – even though the misconduct was unrelated to Mr. Blue's case – because it undermines the sergeant's credibility. *See Robinson*, 627 F.3d 941; *King*, 71 Fed. Appx. 192. Additionally, evidence of Sergeant Gialamas's willingness to provide false testimony in state court,[8] standing alone, is sufficiently material to support a new trial because "perjury is different." *United States v. Cuffie*, 80 F.3d 514, 518 (D.C. Cir. 1996) ("[T]he undisclosed evidence that Moore had lied under oath in a previous court proceeding . . . identified an infirmity in Moore's testimony that is almost unique in its detrimental effect on a witness'[s] credibility."); *Quiles*, 618 F.3d 383, 394-95 (3d Cir. 2010) (finding that evidence of witness's conviction for sexual abuse of child did not support motion for new trial, though evidence that witness "committed blatant perjury" in another case "might be reason to doubt his testimony in this case").

---

[8] It is Mr. Blue's contention that Sergeant Gialamas's testimony regarding how Mr. Green sustained his injuries on October 27, 2011, cannot be reconciled with the jury's finding that Officer Williams was guilty of assault. By convicting Officer Williams of assault, the jury indicated that it did not believe Sergeant Gialamas's testimony that Mr. Green (who was handcuffed and being held by the sergeant) "fell" to his knees as he attempted to move toward Officer Williams. By convicting Office Williams, the jury also indicated that it did not believe Sergeant Gialamas's testimony that Officer Williams laid hands on Mr. Green only to "assist" the sergeant in lifting Mr. Green up after his alleged fall.

### C. Evidence of Sergeant Gialamas's Conviction and Apparent Perjury Would Probably Result in Dismissal or Acquittal

The evidence discrediting Sergeant Gialamas would probably result in either the government's dismissal of the charges against Mr. Blue (because the underlying evidence would be suppressed by the court) or, alternately, acquittal.

As with the factors discussed above, the "probability of acquittal" factor depends on the quality and quantity of evidence that the government introduced to secure Mr. Blue's conviction in the first place. In *Custis*, 988 F.2d 1355 (4th Cir. 1993), the defendant sought a new trial after two of the three officers who testified against him at trial were charged with perjury in an unrelated matter. The Fourth Circuit, affirming the district court's denial of relief, stated that it was unlikely that a new trial would result in the defendant's acquittal. The court explained that the officer whose credibility had not been discredited had provided testimony that corroborated the testimony of the two discredited officers. Additionally, the defendant himself had admitted that he had carried a package of cocaine into the store where he had been arrested. 988 F.2d at 1360.

In *Robinson*, the Fourth Circuit provided a similar explanation for why the state officers' misconduct did not warrant retrial of the counts of conviction secured by the federal officers: "Even when one eliminates all traces of evidence from the dismissed officers, there remains overwhelming evidence of Robinson's guilt. Nineteen co-defendants and cooperating witnesses testified that Robinson conspired to traffic drugs." 627 F.3d at 950; *see United States v. Reams*, 359 Fed. Appx. 366, 369 (4th Cir. 2009) (evidence of impeachment did not warrant new trial because discredited witness's testimony was "corroborated by the officers' testimony and [defendant]'s statements after he was arrested"); *United States v. Adams*, 161 F.3d 3 (4th Cir. 1998) (affirming denial of new trial

motion because "even if the newly discovered impeachment evidence might have totally destroyed the credibility of the two surprise witnesses there was still ample evidence before the jury which would support the verdict they returned") (internal quotations omitted).

Unlike the cases described above, there does not exist overwhelming evidence of Mr. Blue's guilt. (Indeed, the court struggled to reach a decision on Mr. Blue's motion for judgment of acquittal on counts one and three, calling it a "close" and "difficult" case.) The court determined that Sergeant Gialamas's uncorroborated testimony that he saw Mr. Blue hand a "brownish" object to Mr. Townsend on June 29th was the critical piece of evidence giving rise to probable cause to believe he committed a crime. The court also found that when Mr. Blue was arrested on July 13th (leading to the discovery of the key to the apartment where the drugs were found), it was based solely on probable cause to believe he engaged in a drug transaction on June 29th. The government did not argue, nor could they, that officers' observations of Mr. Blue on July 13th independently gave rise to probable cause. At the suppression hearing, the government plainly admitted that it was relying on Sergeant Gialamas's "visual observation" of the transaction to justify Mr. Blue's arrest. At a rehearing on the motion to suppress, the court would probably grant the motion based on evidence undermining the sergeant's credibility.

If Mr. Blue were to be granted a new trial, he could introduce evidence of Sergeant Gialamas's criminal conviction to attack his credibility. Rule 609 of the Federal Rules of Evidence allows the introduction of criminal convictions to attack a witness's character for truthfulness. Fed. R. Evid. 609. In the event of a new trial, Mr. Blue also could attack Sergeant Gialamas's credibility by introducing evidence that he testified falsely in a state court proceeding. Under Rule 608(b) of the Federal Rules of Evidence, a party may inquire on cross-examination into specific instances of

conduct that is probative of the witness's character for truthfulness. Fed. R. Evid. 608(b). In practice, courts tend to grant "wide latitude" under Rule 608(b) to defendants who seek to impeach the credibility of prosecution witnesses. *See United States v. White*, 692 F.3d 235, 248 (2d Cir. 2012) (stating that courts "must [] give wide latitude to a defendant in a criminal case to cross-examine government witnesses."); *United States v. Whitehead*, 618 F.2d 523, 529 (4th Cir. 1980) ("[C]ross-examination of a witness about past false statements he made under oath would be proper under [FRE 608(b)] as an instance of the witness's conduct probative of untruthfulness.") (citing *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996)); *United States v. Blanco*, 861 F.2d 773, 781 (2d Cir. 1988) ("A trial judge abuses his discretion in curtailing cross-examination of a government witness when the curtailment denies the jury sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government."); *United States v. Whitmore*, 359 F.3d 609 (D.C. Cir. 2004) (finding that district court abused its discretion by limiting defendant's cross-examination of testifying officer regarding prior instance of lying under oath).

Based on the combined impeachment evidence of Sergeant Gialamas's criminal conviction and false testimony, it is unlikely that any jury would have considered him to be a credible witness. And in the absence of Sergeant Gialamas's testimony that Mr. Blue engaged in a heroin sale on June 29th, it is unlikely that any jury would have found him guilty of the heroin offenses charged in counts one and three.

For the reasons stated here as well as in the original motion, Mr. Blue respectfully requests that this Honorable Court grant his motion for a new trial in light of the newly discovered evidence.

Respectfully submitted this 19th day of December, 2014.

JAMES WYDA
Federal Public Defender for the
District of Maryland

 /s/  Sapna Mirchandani
SAPNA MIRCHANDANI
Appellate Attorney
Office of the Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD  20770
(301) 344-0600

*Counsel for Appellant*

<u>CERTIFICATE OF SERVICE</u>

This is to certify that the foregoing Defendant's Reply to the Government's Opposition to His Motion for a New Trial was filed electronically via CM/ECF, which automatically sends notice of such filing to the following registered CM/ECF user:

John W. Sippel, Jr.
Assistant U.S. Attorney
Office of the U.S. Attorney
36 South Charles Street, 4th Floor
Baltimore, MD 21201

on this 19th day of December, 2014.


   /s/   Sapna Mirchandani   
Sapna Mirchandani