**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA     *

    v.     *

                       **Criminal No.: ELH-11-0508**

DANIEL BLUE     *

...oOo...

**MEMORANDUM**

Presently pending before this Court is the motion for new trial (ECF 121, "Motion") filed by defendant Daniel Blue, based on his claim of newly discovered evidence. *See* Fed. R. Crim. P. 33.

On June 22, 2012, a jury convicted Mr. Blue (ECF 90) on Counts One and Three of a Superseding Indictment (ECF 27), charging him with various drug offenses. He was sentenced on January 18, 2013, to a mandatory minimum term of ten years' imprisonment. ECF 105, 106, 107. On October 3, 2014, while Mr. Blue's case was on appeal to the United States Court of Appeals for the Fourth Circuit, he filed the instant Motion, grounded on the post-trial misconduct conviction of a Baltimore City police officer, Sergeant Marinos Gialamas, who had testified for the government at Mr. Blue's pretrial motions hearing and at Mr. Blue's trial. The police officer's conviction in the Circuit Court for Baltimore City in February 2014 resulted from events that occurred in October 2011, involving the arrest of an individual named Antoine Green. The arrest of Mr. Green was unrelated to the investigation and prosecution of Mr. Blue.

On October 31, 2014, the Fourth Circuit granted Mr. Blue's unopposed motion to stay his appeal and remanded the case to this Court for consideration of the Motion. ECF 124, 127; *see* Fed. R. Crim. P. 33(b)(1) ("If an appeal is pending, the [trial] court may not grant a motion for new trial until the appellate court remands the case."). Thereafter, on December 2, 2014, the

government filed an opposition to the Motion (ECF 129, "Opposition"), to which the defendant replied. ECF 131, "Reply." Both parties also submitted exhibits. In addition, the defendant filed a letter (ECF 132) to clarify that the "briefs may not make sufficiently clear that inherent in Mr. Blue's request for a new trial is a request for a renewed hearing on his motion to suppress evidence."

I held a hearing on the Motion on January 8, 2015, at which Mr. Blue appeared, with his attorneys. For the reasons set forth below, I will deny the Motion.

## I. Factual Background

### A. Overview

During police surveillance of Keith Townsend on June 29, 2011, Sgt. Gialamas claimed to have observed a hand-to-hand drug transaction between Townsend and Blue. Townsend was arrested on that date, and heroin was recovered from him. Two weeks later, on July 13, 2011, Blue was arrested, without a warrant, based on the criminal conduct observed by Sgt. Gialamas on June 29, 2011. Blue's arrest led to the discovery of a substantial quantity of heroin.

Blue was initially indicted on September 14, 2011. ECF 1. In a Superseding Indictment filed on December 7, 2011, both Blue and Townsend were charged with various offenses. In particular, in Count One both defendants were charged with conspiracy to distribute and possess with intent to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1). Count Two charged that on June 29, 2011, both defendants possessed with intent to distribute a mixture or substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1). Count Three pertained only to Blue. It charged that on July 13, 2011, Blue knowingly and intentionally possessed with intent to distribute 100 grams or more of a mixture or substance containing a detectable amount

of heroin, in violation of 21 U.S.C. § 841(a)(1).  In sum, Blue was charged in all three counts with drug offenses that allegedly occurred on two dates:  June 29, 2011 and July 13, 2011.

On June 7, 2012, Townsend pled guilty to Count Two.  *See* ECF 66, 67, 68.  He was subsequently sentenced to 37 months' imprisonment.  ECF 98, 99, 100.

Blue filed several pretrial motions, *see* ECF 15, 16, 17, 18, 19, 20, which were heard and considered on May 30, 2012 (ECF 62; 63; 74; 119)[1] and June 7, 2012 (ECF 71; 72, 120).  In general, the motions sought suppression of statements made by Blue following his arrest; suppression of the keys recovered from Blue's pocket during a search incident to his arrest; suppression of heroin found during the execution of a search warrant issued by a Maryland State judge on July 13, 2011, for apartment 1D at 7 Rosecrans Place in Nottingham, Baltimore County, for which the defendant had the key at the time of his arrest.  In addition, Blue challenged the warrantless use by the police of a GPS slap-on tracking device,[2] and he also attacked the search warrant itself.  I orally denied the motions, for the reasons stated in open court.  *See* ECF 63; ECF 72; ECF 74; ECF 119; ECF 120.  The motions are discussed in more detail, *infra*.[3]

Blue proceeded to trial beginning on June 18, 2012.  At the close of evidence, I denied the defendant's motion for judgment of acquittal as to Count Two, but reserved ruling as to

---

[1] The record contains multiple copies of the transcripts of the motions hearing of May 30, 2012.  In particular, ECF 73 (transcript of testimony) and ECF 74 (transcript of oral ruling) are largely the same as ECF 119 (transcript).

[2] The warrantless use of the GPS device preceded the Supreme Court's decision in *United States v. Jones*, _____ U.S. _____, 132 S. Ct. 945 (2012).

[3] On May 30, 2012, I denied all of the pretrial motions, with the exception of ECF 19, pertaining to the sufficiency of the search warrant.  As to ECF 19, the hearing was continued to June 7, 2012, to permit the parties to provide additional briefing.  *See* ECF 64 (defense); ECF 65 (government).  After further argument on June 7, 2012, as to ECF 19, I denied that motion.  *See* ECF 72; ECF 120.

Counts One and Three, pursuant to Fed. R. Crim. P. 29(b). *See* ECF 81. On June 20, 2012, the jury returned a verdict of guilty as to Counts One and Three, and a verdict of not guilty as to Count Two. ECF 90.

Thereafter, I set a briefing schedule for the Rule 29 motion. ECF 81; *see also* ECF 91 (defendant's brief); ECF 94 (government's response). Argument was presented on the Rule 29 motion at a hearing on August 15, 2012. ECF 95; ECF 115.[4] At the conclusion of the hearing, I orally denied the Rule 29 motion. *See* ECF 115 (transcript).

On November 2, 2012, the federal prosecutor assigned to this case, AUSA John Sippel, Jr., wrote a letter to Mr. Blue's defense counsel, advising that Baltimore City Police Sergeant Marinos Gialamas, a government witness at Blue's motions hearing and at his trial, had been charged in the Circuit Court for Baltimore City with second degree assault and misconduct in office. ECF 129-1. As noted, the charges stemmed from the arrest of Antoine Green in October 2011. There is no contention that the government knew of any accusations against Sgt. Gialamas at the time of Mr. Blue's trial, or even that Sergeant Gialamas knew at that time of Mr. Blue's trial that he was under investigation for his conduct in connection with the arrest of Mr. Green.

At Mr. Blue's sentencing on January 18, 2013,[5] defense counsel informed me that Sgt. Gialamas had been charged in a Maryland court with second degree assault and misconduct, and that the charges were pending. ECF 118 at 2. Defense counsel advised that a motion for new

---

[4] At the hearing, I expressed my surprise at the verdict, stating, ECF 115 at 2-3: "I continue to be amazed . . . how that ended up in an acquittal. I thought that was by far and away the strongest count, and one where I readily thought the government proved its case beyond a reasonable doubt. But I suppose that's why people . . . pick juries. . . ."

[5] Sentencing was initially set for November 29, 2012, but was postponed at the joint request of counsel. ECF 103.

trial on behalf of Mr. Blue was not yet "ripe" because the charges were pending against Sergeant Gialamas, and he was awaiting trial. *Id*. at 3.

Thereafter, I sentenced Mr. Blue to ten years' imprisonment, the mandatory minimum term. *See* ECF 105, 106, 107. On January 25, 2013, Mr. Blue timely noted an appeal to the Fourth Circuit. *See* ECF 108. According to defendant, two issues were raised on appeal: First, whether evidence recovered from a warrantless search should have been excluded from trial; and second, whether the government presented evidence sufficient to prove that defendant constructively possessed the drugs found in a third party's apartment on July 13, 2011. *See* ECF 121 at 1-2.

## B. Mr. Blue's Pretrial Motions

As noted, Mr. Blue filed several pretrial motions. *See* ECF 15, 16, 17, 18, 19, 20. The government responded (ECF 56), and Mr. Blue replied. *See* ECF 58. At the motions hearing held on May 30, 2012, the government presented the testimony of two Baltimore City police officers: Sergeant Marinos Gialamas and Task Force Officer William Bearde. The defendant called Detective James McShane. *See generally* ECF 119-133 (transcript).

The evidence revealed that on June 29, 2011, Detective McShane was involved in the arrest of an individual who then sought to cooperate with police by disclosing his source for heroin. *Id.* at 121-22. McShane decided that the cooperator should contact his source in the presence of TFO Bearde and Sergeant Gialamas. *Id.* at 123.

At the hearing, Sergeant Gialamas testified that he was a Baltimore City police officer for more than 17 years and had been involved in over a thousand narcotics arrests. *Id.* at 6-7. He

recalled that a "confidential source" ("C.S.")[6] had identified an individual known to the C.S. as Choke, later identified as Keith Townsend, as his source of "raw heroin." ECF 119 at 8.  On June 29, 2011, the C.S. agreed to set up a controlled buy of heroin from Townsend, under police surveillance. *Id.* at 8-12, 44.  Townsend was described as the "target" of the surveillance. *Id.* at 38.

The C.S. indicated that Townsend resided at 715 North Curley Street in Baltimore City. *Id.* at 11.  At about 11:30 a.m. on June 29, 2011, the C.S. drove with Sgt. Gialamas and TFO Bearde in an unmarked police vehicle to the 800 Block of North Curley Street, where they could observe the 700 block of North Curley Street. *Id.* at 9-11, 27.  Gialamas described Curley Street as a "narrow street" and a "small side street." *Id.* at 40.  He also noted that there was very little traffic on that street at the time, *id.*, and stated that he had a "clear and unobstructed view of the 700 block of North Curley Street[.]" *Id.* at 10-11.

Gialamas was seated in the driver's seat of the police vehicle, ECF 119 at 27, and Bearde was in the front passenger seat. *Id.* at 29.  The C.S., who was also in the vehicle, *id.* at 10, telephoned Choke and "ordered" "50 CD's" of heroin. *Id.* at 12.  The C.S. indicated to the officers that the term "CD's" was "street code" or "slang" for heroin. *Id.* at 9.

After the C.S. placed the phone call to Townsend to obtain the heroin, the C.S. reported that Townsend said, "In about 15 minutes." *Id.* at 12.  Gialamas understood that to mean that the heroin would "be ready in about 15 minutes." *Id.*  Shortly after the C.S. called Townsend, Townsend was observed as he left his residence and approached the driver's side of a Lexus SUV. *Id.* at 12-13.  The C.S. pointed out Townsend to the police. *Id.* at 27.  Gialamas indicated that he had "a clear and obstructed view" of the Lexus. *Id.* at 13.  Gialamas also stated that he

---

[6] The C.S. is an individual whose initials are H.F.  Although his identity was disclosed at trial, I shall refer to him either as C.S. or H.F.

did not observe any activity indicative of a hand-to-hand drug transaction between Townsend and anyone in the Lexus.  ECF 119 at 13.  Nor did he see Townsend make any movement towards his left front pants pocket.  *Id.* at 14.  Townsend then returned to his residence.  *Id.* at 14-15.  The Lexus was subsequently stopped by other police officers.  *Id.* at 30-33.[7]

Shortly thereafter, Sergeant Gialamas observed Townsend appear to answer a phone call.  *Id.* at 15.  Then, Townsend again left his residence, with a cellphone in his hand.  *Id.*  Townsend walked in the direction of the police vehicle.  *Id.* at 15, 16.  At the same time, an individual, later identified as Mr. Blue, was walking towards Townsend.  *Id*. at 16, 38.  Gialamas had no knowledge of Mr. Blue prior to the events of June 29, 2011.  ECF 119 at 26, 34-35.

Gialamas had a "clear and unobstructed view" of Townsend.  *Id.* at 15.  And, he could see Townsend and Blue, without the use of binoculars, from his location -- a distance of about 30 yards.  *Id.* at 16-17, 39-40.  He also confirmed that he had a "straight line of sight" to Blue and Townsend.  *Id.* at 17.

Because the C.S. had indicated that Choke "was the middle man to order a large amount of narcotics from . . . ," *id.* at 29, Gialamas wanted "to see who [Townsend] meets up with, to receive the amount of narcotics that the confidential source ordered up."  ECF 119 at 38.  Gialamas explained that when he saw Blue, his "attention was drawn to the hands. . . ."  *Id.*  Gialamas stated, *id.* at 37: "Well, we were waiting for a transaction to happen.  So usually . . . you watch people's hands."  Gialamas saw that in Blue's left hand, "as he's approaching Mr. Townsend, [Blue's] hand was closed but it wasn't closed all the way, and there was an item in his hand."  *Id.* at 16.

---

[7] McShane instructed the police to follow the Lexus SUV.  ECF 119 at 124.  Although the SUV was stopped, *id.* at 31, Gialamas did not participate in the stop.  *Id.*  Apart from Townsend's interaction with the Lexus, the events as to the Lexus are not relevant to the disposition of this Motion.

Gialamas described a "brownish/tannish item" that protruded from Blue's left, "semi-closed fist." ECF 119 at 40; *see also id.* at 16-17; 37-40.  According to Gialamas, when Blue and Townsend "got close," *id.* at 17, Blue's left hand came up, it opened up, and then Blue handed the item in his left hand to Townsend. *Id.* at 17-18, 39.  At that point, the two men were "not exactly face to face. . . ." *Id.* at 18.  Townsend took the item with his left hand and placed the item into his left pants pocket. *Id.* at 39.  Gialamas "knew it was an object" in Blue's hand, *id.*, but could not identify the object. *Id.*  Gialamas testified:  "So from my training and experience, whatever he [i.e., Blue] had in his hand he gave to Mr. Townsend.  At that time, Mr. Townsend put that item into his left front pants pocket."  ECF 119 at 18; *see also id.* at 39.  Gialamas believed he had witnessed a hand-to-hand drug transaction between Blue and Townsend. *Id.* at 46.

Townsend was promptly arrested on his front porch, *id.* at 20, and 50 grams of "raw heroin" were recovered from Townsend's left front pants pocket. *Id.* at 21.  The heroin was found between two slices of bread wrapped in Saran Wrap. *Id.*  Mr. Blue was not arrested at that time, however. *Id.* at 44.

Notably, the location of the drugs found on Mr. Townsend – in his left pants pocket – was consistent with Gialamas's observation and testimony.  And, the quantity matched precisely the quantity that was ordered minutes before by the C.S. *See id.* at 12, 21.

TFO Bearde testified that he had been a Baltimore City Police Officer for ten years, and a task force officer with the Drug Enforcement Administration for six years. *Id.* at 50-51.  He is a deputized federal agent.  ECF 119 at 53-54.

Bearde recalled that on the date in question, he and Detective McShane interviewed an individual (the C.S.), who had just been arrested and wanted to cooperate with law enforcement.

8

ECF 119 at 54.  The C.S. disclosed an individual known to him as Choke as a source of supply for raw heroin, and agreed to place a phone call to Choke to purchase heroin.  *Id.* at 54-55.

According to TFO Bearde, the C.S. knew where Townsend resided.  *Id.* at 55.  They used an unmarked police vehicle with tinted windows to protect the identity of the C.S. and, with the C.S. in the rear seat, Bearde and Gialamas drove to the vicinity of the 700 block of North Curley Street, where Townsend lived.  *Id.* at 55, 57.  Bearde added that he was seated next to Gialamas in the front passenger seat.  *Id.* at 56-57.

Bearde's testimony as to the C.S.'s phone call to Townsend was consistent with that of Gialamas.  For example, he indicated that the C.S. used the "street term" of "CD's" for heroin, and ordered 50 C.D.'s of heroin from Townsend.  *Id.* at 55.  He also recalled that the C.S. reported that the drugs would "be ready in about 15 minutes."  *Id.* at 56.

Bearde, who was in the front passenger seat, noted that his view of North Curley Street was "obstructed" by a parked vehicle.  *Id.* at 56-57.  As a result, he did not see the exchange between Blue and Townsend that Gialamas had seen.  *Id.* at 58.  Notably, however, he heard Gialamas announce that he saw a hand-to-hand transaction.  *Id.*

The interaction between Mr. Blue and Mr. Townsend was recorded by two nearby pole cameras.  *See id.* at 22-25.  These are elevated surveillance cameras situated on street poles.  On the date in question, they were manually operated by the CityWatch unit.  *Id.* at 57.  One was located at Madison and Curley Streets, and the other was located at Monument and Curley.  *Id.* at 25.  The videos were played by the government at the motions hearing, and are discussed, *infra*.[8]

The police subsequently learned that Mr. Blue had a court appearance in a State court in Baltimore on July 13, 2011.  *Id.* at 62.  On that date, the police attached a slap-on global

---

[8] As the record reflects, *e.g.*, ECF 119 at 136, I watched the video more than once and it was slowed down, frame by frame.

positioning device ("GPS") to Mr. Blue's motor vehicle, which was in the vicinity of the State courthouse. ECF 119 at 62-64. TFO Bearde recounted that Mr. Blue was followed from court to an apartment complex in Baltimore County at 7 Rosecrans Place, without the use of the GPS. ECF 119 at 64-65.

Both TFO Bearde and Detective McShane saw Mr. Blue entering 7 Rosecrans Place, and he exited about 5 minutes later, holding a small plastic container. *Id.* at 65-66 (Bearde); 130-131 (McShane). Mr. Blue was followed to Lake Montebello in Baltimore City, also without the use of GPS. *Id.* at 66-67. The area is a known drug area. *Id.* at 67. Blue parked his vehicle and appeared to scan the area. *Id.* Blue then approached another vehicle, operated by an individual later identified as Jamar Holt. *Id.* at 66-67 (Bearde); 131-32 (McShane). Mr. Blue entered Mr. Holt's car, and the two slowly drove around the lake, *id.* at 66-67 (Bearde); 131-32 (McShane), a distance of about a mile. *Id.* at 132. TFO Bearde was of the view that Blue's actions were "indicative of a drug transaction. . . ." *Id.* at 67-68.

The police subsequently attempted to stop Mr. Holt, who was driving a Jeep. ECF 119 at 68-69. In the process, Holt attempted to run over Det. McShane, *id.* at 69, and police fired their guns at Holt. But, Holt drove away, at a high rate of speed. *Id.* at 69 (Bearde); 132 (McShane). He was eventually apprehended at a hospital. *Id.* at 70.

The police determined that they had probable cause to arrest Mr. Blue, based on the events of June 29, 2011, involving the drug transaction between Blue and Townsend that had been witnessed by Gialamas. ECF 119 at 68, 70, 89, 92. The GPS was activated, *id.* at 70, and Mr. Blue's vehicle was found in the 4900 block of Sinclair Lane in Baltimore City. *Id.* He was arrested, without a warrant, upon exiting a residence on that block. *Id.* at 71.

TFO Bearde testified that he advised Blue of his *Miranda* rights, ECF 119 at 71, and Blue indicated that he understood his rights.  *Id.*  Blue was searched incident to his arrest, *id.* at 74, and a "set of keys" was recovered from him.  ECF 119 at 74.  Bearde "handed the keys" to Sergeant Gialamas, and told him to go to 7 Rosecrans, where Mr. Blue had been observed earlier that day, and "try the keys."  *Id.*  When Gialamas came upon Apartment 1-D, "the key worked and opened the door."  *Id*.  Brandon Cooper was asleep in the apartment, in which he and Tiffany Elliott resided.  ECF 131 at 9.  Officers secured the apartment while Bearde applied for and obtained search and seizure warrants from a State judge for Apartment 1-D at 7 Rosecrans Place and for the residence at 4913 Sinclair Lane, from which Blue had exited.  ECF 119 at 74-75.

After Mr. Blue was advised of his *Miranda* rights, *id.* at 71, he said he wanted to cooperate.  *Id.*  He acknowledged that he met Mr. Holt to discuss a drug transaction.  *Id.* at 72.  However, the police beleived that Blue "lied" about the house from which he had been seen exiting on Sinclair Lane, and he also lied about the apartment building he had entered on Rosecrans.  *Id*. at 71-74.

Gialamas participated in the execution of the search and seizure warrant for Apartment 1-D at 7 Rosecrans Place.  Police recovered 120 grams of heroin in a footstool in the bedroom of Ms. Elliott.  ECF 131 at 9.  Those drugs formed the basis of the charges against Mr. Blue in Counts One and Three of the Superseding Indictment.  *Id.*

At noted, the surveillance videos were played at the motions hearing.  In my view, they clearly established an interaction between Blue and Townsend.  I concluded that the video "was helpful" but "not probative" of whether an item was passed from Blue to Townsend.  ECF 119 at 139.  I stated, in part:  "What it does show is, I think it clearly shows hand-to-hand contact.  And I think it shows Mr. Townsend putting something in his pocket immediately, instantly, after his

contact with Mr. Blue."   ECF 119 at 139.   However, I also said, *id.*:  "But I can't say from looking at that that Mr. Blue had anything in his hand, his left hand.  I can say he had something in his right hand, and it looked like a cell phone.  It isn't that it rules it out, it just doesn't rule it in. . . ."   In addition, I said, *id.* at 137:  "It doesn't [show] that [Blue] doesn't have anything [in his hand], but it doesn't show that he did."

As a result, Gialamas provided the only direct evidence at the motions hearing establishing that, on June 29, 2011, Mr. Blue transferred an object to Mr. Townsend.  But, the totality of the evidence, direct and circumstantial, clearly supported that conclusion.  Among other things, in the presence of two police officers, the C.S. called Townsend to purchase "50 CDs" of heroin, i.e., 50 grams, ECF 119 at 9, 12; the drugs were to be ready in 15 minutes, *id.* at 12; the interaction between Townsend and Blue followed within that time, when Blue and Townsend met on the street, *id.* at 16-18; Gialamas saw Blue's hand go up and he saw Townsend receive an item from Blue that Townsend put in his pants pocket, *id.* at 17-18, 39; Townsend was arrested immediately thereafter, *id.* at 20; 50 grams of heroin were recovered from Townsend's pocket, which is the exact quantity that the C.S. had ordered, *id.* at 12, 21; and the interaction between Blue and Townsend was recorded by City surveillance cameras, *id.* at 22-25.

As to the warrantless arrest of Mr. Blue on July 13, 2011, I said, in part, ECF 119 at 200: "So one question that I must answer is whether there was probable cause on July 13 of 2011 for the arrest of the defendant based on the events of June 29, 2011."   In my view, the answer was "not even close."  *Id.*   I said:  "It's overwhelmingly sufficient cause, probable cause, to justify the warrantless arrest of the defendant on July 13, 2011, based on the events that occurred on June 29 of 2011."  *Id.*   After reviewing the concept of probable cause, *id.*, I added:  "I just don't think it's a close question . . . ."   Therefore, I upheld the warrantless arrest of the defendant on

July 13, 2011, concluding that it was justified by probable cause to believe the defendant committed a drug offense on June 29, 2011.  ECF 119 at 200.[9]

In reaching my decision, I found that Sergeant Gialamas was "very credible," and observed that Bearde and Gialamas were trained in drug trafficking investigations.  *Id.* at 194-95.  In crediting the testimony of Sergeant Gialamas, I noted that he had an unobstructed view of Blue and Townsend on June 29, 2011, and that he witnessed what he believed was a hand-to-hand drug transaction on that date.  *Id.* at 195.  I ruled orally, in part, as follows, *id.* at 194-96:

> The evidence shows that on or about June 29 of 2011, Detective McShane came into contact with an individual who had been referred to as a confidential source.  He apparently had been arrested on or about that date and wanted to cooperate, and indicated that he was familiar with a person he knew as Choke, later identified as Keith Townsend, and offered to contact Mr. Townsend and arrange a purchase of heroin in the presence of both Detective Bearde and Detective Gialamas.

> The confidential source, in fact, called Mr. Townsend, requested 50 CD's, which was, the testimony showed, street slang for 50 grams of raw heroin.  According to the CS, the confidential source, it would take about 15 minutes to obtain the drugs.  We know in that 15 minutes a Lexus appeared, and Mr. Townsend had some physical contact with that Lexus.  In my view, that is, at least in the context of the issues presently pending, somewhat of a red herring.

> The evidence also showed that, within that 15-minute time period, Mr. Townsend encountered Mr. Blue, the defendant, and he was identified by at least two of the law enforcement officers today.

> I watched the video.  You all know that.  The record should reflect that.  It was not entirely clear from the video that there was a hand-to-hand transaction between Mr. Blue and Mr. Townsend.  In fact, I couldn't see that at all.  But what I did see was immediately they appeared to touch hands.  I couldn't see that Mr. Blue had anything in his hand that he gave to Mr. Townsend.  But I did see, immediately following this encounter, that Mr. Townsend's hand went in his left front pants pocket.

> Detective Gialamas testified that he had an unobstructed view.  He must have been asked this question several times, at the very least.  And he testified

---

[9] In ECF 131 at 10 the defense concedes that the Court "carefully weigh[ed] the evidence."

that he witnessed a hand-to-hand transaction. And I accept that testimony as credible testimony. He didn't see such a transaction between Mr. Townsend and anyone in the Lexus. I believe his testimony was that he did not order the stop of the Lexus, although it was later stopped. He did, however, testify unequivocally that he witnessed this hand-to-hand transaction between Mr. Blue and Mr. Townsend.

Immediately thereafter, the arrest team was contacted and descended upon Mr. Townsend. Within minutes he was arrested. And lo and behold, 50 grams of heroin were recovered from that same front pants pocket, in between two slices of bread. And as to that, I should add as well a little bit more description.

Detective Gialamas said that when he saw Mr. Blue with the naked eye, no binoculars were used, Mr. Blue's hand was closed somewhat, but not completely closed, and something was sticking out, which I think he described as sort of tan or light brown. We don't know what kind of bread it was. Maybe it was whole wheat and that's why it was tan. Anyway, that's what he did say. And, really, that's uncontradicted.

Thereafter, Mr. Blue was not arrested on that day. Obviously, as I just said, Mr. Townsend was [arrested].

### C.  Trial Proceedings

The evidence at trial paralleled what was presented at the motions hearing, so I need not repeat it here. In addition, it was buttressed by the testimony of the confidential source, H.F., who had telephoned Townsend on June 29, 2011, in the presence of TFO Bearde and Sgt. Gialamas, to place an order for 50 grams of heroin. *See* ECF 92 at 81-91 (trial testimony).

H.F. testified at trial that he had been arrested on June 29, 2011, and sought to cooperate with law enforcement. *See id.* at 80, 93. He identified "a guy named Choke" as his source of supply for heroin, *id.* at 81. At trial, he knew of Choke by the name Keith Townsend. *Id.* He did not know Mr. Blue, however. *Id.* at 83. H.F. described Mr. Townsend as a "middleman." *Id.* at 82.

While sitting in an unmarked police car with Gialamas and Bearde on June 29, 2011, H.F. contacted Townsend. The police vehicle was positioned so that H.F. could see the

14

interaction between Townsend and Blue, and H.F. stated that he had a "clear view." ECF 92 at 84; *see also id*. at 85-86. Further, H.F. indicated that he is familiar with hand-to-hand drug transactions, *id.* at 88, and testified that he saw "a hand-to-hand transaction" between Townsend and Blue. *Id.* at 87. Although H.F. could not see what was in Mr. Blue's hand, *id.*, he saw Townsend "grab something" from Blue, and Mr. Townsend then "tucked it and walked away." *Id.* When H.F. was asked what he thought he observed, he reiterated that it was a "hand-to-hand transaction." *Id.* at 90.

The government also called Special Agent Todd Edwards of the Drug Enforcement Administration. He testified, without objection, as an expert in the manner and means of drug trafficking. ECF 92 at 209. He described, *inter alia*, hand-to-hand drug transactions, *id.* at 210-11, as well as the surreptitious use of stash houses. *Id.* at 211-213.

At the conclusion of the case, I denied the defendant's motion for judgment of acquittal as to Count Two, pertaining to the conduct on June 29, 2011. But, I reserved ruling as to Counts One and Three, with respect to the events of July 13, 2011. As noted, the jury acquitted Mr. Blue of Count Two, but convicted him as to Counts One and Three. The parties subsequently briefed the Rule 29 motion as to those counts. *See* ECF 91, 94.

As noted, I considered the Rule 29 motion at a hearing on August 15, 2012. *See* ECF 95, 115. To be sure, I characterized the motion as "close" and "difficult." ECF 115 at 45. Nevertheless, I denied the motion. *Id.* at 45-46. My reasons are set forth in ECF 115 at pages 45-53.

### D.  Post-Trial Events

In or about October 2012, Sergeant Gialamas was charged in the Circuit Court for Baltimore City with four offenses: second degree assault of Antoine Green on October 27, 2011;

misconduct in office by the commission of a wrongful and improper act; misconduct in office by the commission of a lawful act in a wrongful and improper manner; and misconduct in office by the knowing and corrupt failure to do an act required by the duties of the office. *See State v. Gialamas*, Case No. 212292001; Defense Exhibits A and C, ECF 131-1; 131-3. The State prosecutor described the three common law misconduct-in-office charges as malfeasance, misfeance, and nonfeasance, respectively. ECF 131-2 at 1.

A fellow officer, Anthony Williams, was also charged as a result of the events of October 27, 2011. In particular, he was charged with second degree assault and hindering and obstructing a police officer in the performance of lawful duties. *See* Defense Exhibit D, ECF 131-4.

The charges arose from the arrest of Mr. Green on October 27, 2011, a suspected drug dealer who had unlawfully entered the residence of a person who happened to be romantically involved with Officer Williams. Gialamas was the highest ranking officer at the scene. ECF 131-2 at 2. According to the State, the two officers cooperated in stomping on Green and also engaged in other misconduct. *Id.* at 2-4. The incident as to Mr. Green was factually unrelated to the prosecution of Mr. Blue.

Baltimore City Assistant State's Attorney A. Paul Pineau, Esquire, the prosecutor in the State's case against the police officers, wrote a letter to Blue's attorney on January 3, 2013. *See* government Exhibit 2, ECF 129-2. The State acknowledged in that letter that the charges against Sergeant Gialamas "do not allege false testimony or false statement, but rather focus on the use of force, and threat thereof, by Sergeant Gialamas and his co-defendant." *Id.* A summary of the State's version of the events of October 27, 2011, is found in the State's Sentencing Memorandum for Sergeant Gialamas. *See* Defense Exhibit B, ECF 131-2.

Gialamas and Williams pled not guilty to the charges.  In February 2014, both men proceeded to a jury trial in the Circuit Court for Baltimore City (Hon. M. Brooke Murdock, presiding).  At his trial, Sergeant Gialamas testified in his own defense.  *See* Defense Exhibit F, ECF 131-6.

After a five-day trial, the jury returned its verdict on February 10, 2014.  *See* ECF 131-1 at 4-5.[10]  The jury acquitted Gialamas of second degree assault and misconduct in office by the commission of a wrongful and improper act.  *Id.* at 5.  The jury failed to reach a unanimous verdict as to the third count, misconduct in office by the commission of a lawful act in an improper manner, and that charge was subsequently dismissed.  *Id.*  However, the jury returned a guilty verdict as to Count Four, misconduct in office by the knowing and corrupt failure to do an act required by the duties of the office.  The State prosecutor has referred to this offense as one of "nonfeasance."  ECF 131-2 at 1.  Williams was convicted of both charges.

Based on the verdict, Mr. Blue maintains that Gialamas's testimony was not credited by the jury.  In addition, he claims Gialamas's testimony was perjurious.

As to Gialamas, the State prosecutor sought a two year sentence, with all but 60 days suspended.  *See id.* at 4-5.  On April 18, 2014, Judge Murdock sentenced Sergeant Gialamas to six months' imprisonment, all of which was suspended; one year of probation; and 250 hours of community service.  ECF 131-1 at 5.  On May 5, 2014, Gialamas noted an appeal to the Maryland Court of Special Appeals.  *Id.* at 6.  Then, on November 6, 2014, the circuit court struck Gialamas's guilty verdict and granted Gialamas a probation before judgment ("PBJ"), pursuant to § 6-220 of the Criminal Procedure Article ("C.P.") of the Maryland Code (2008

---

[10] The evidence concluded on Friday, February 7, 2014.  On Monday, February 10, 2014, the jury was "Allen charged" and a defense motion for mistrial was denied.  ECF 131-1 at 4.

Repl. Vol.).  *See State v. Gialamas*, Case No. 212292001 Circuit Court for Baltimore City (Docket), publicly available at http://casesearch.courts.state.md.us/.[11]

Williams was sentenced to one year imprisonment, with all but 45 days suspended, and 18 months of probation.  *See* Defense Exhibit E, ECF 131-5.

As noted, on October 3, 2014, as a result of what transpired with respect to Sergeant Gialamas, Mr. Blue filed the underlying Motion, seeking a new trial based on newly discovered evidence.  ECF 121.

## II. Discussion

Rule 33(a) of the Federal Rules of Criminal Procedure states, in part:  "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  The Court is guided by five factors, as set forth by the Fourth Circuit in *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993) (citing *United States v. Bales*, 813 F.2d 1289, 1295 (4th Cir. 1987)).  They are as follows, 988 F.2d at 1359:

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e)it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

In order for the defendant to prevail on a motion for new trial, all five elements must be established.  *See United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir. 2001); *United States v. Singh*, 54 F.3d 1182, 1190 (4th Cir. 1995).  The government concedes that Mr. Blue has satisfied

---

[11] In the government's response, ECF 129, the government indicated that Gialamas's sentence was reduced to probation before judgment, ECF 129 at 3, and cited to its Exhibit 3, ECF 129-3.  But, that is an incomplete case history, running only through May 5, 2014.  As noted, the PBJ was granted on November 6, 2014.  The entries on the defense exhibit run only through August 11, 2014.  *See* ECF 131-1.  Moreover, as a result of the PBJ, Gialamas's appeal is no longer pending in the Maryland Court of Special Appeals.  *See* C.P. § 6-220(e) (requiring waiver of an appeal as a condition of PBJ).

the first and second *Custis* factors: *i.e.,* the evidence is newly discovered and the movant has been diligent.  ECF 129 at 4.  In its view, however, the defense cannot satisfy the remaining factors, because the alleged new evidence is nothing more than impeachment evidence, not material to the case, and would not likely produce a different outcome.  *Id.*

According to the government, Sergeant Gialamas's State conviction does not call into question his veracity or truthfulness.  As the government sees it, Gialamas's conviction had nothing to do with the prosecution of Mr. Blue and therefore the impeachment value of the conviction is greatly diminished.  In its Opposition, the government also maintains that Gialamas's conviction is not material to Blue's case, nor would the conviction affect the outcome of the case.  The government asserts:  "Sergeant Gialamas's misconduct conviction . . . is wholly unrelated to Blue's case [and] would not undermine or trump the results of the overall investigation, the numerous witnesses who provided overlapping and/or separate testimony, and physical evidence introduced at trial."  ECF 129 at 8.

Mr. Blue vigorously disagrees, contending that he has satisfied all five *Custis* factors. Blue underscores that Gialamas "was the sole witness to the alleged hand-to-hand transaction involving Mr. Blue" on June 29, 2011 (ECF 131 at 12-13), and that offense "was essential to establishing probable cause for [Mr. Blue's] arrest" on July 13, 2011.  *Id.* at 13.  According to Blue, the Court's denial of the motion to suppress as to Mr. Blue's warrantless arrest "rested primarily" on the Court's finding that Gialamas testified credibly as to his observation of a drug transaction on June 29, 2011.  *Id.* at 9.

Further, Blue maintains that the evidence as to Gialamas is "material," because the "evidence underlying both of Mr. Blue's convictions flowed directly" from his arrest on July 13, 2011 (ECF 131 at 13), which was based on criminal conduct that allegedly occurred on June 29,

2011, witnessed only by Gialamas.  ECF 131 at 12-13.  And, Blue contends that Gialamas played an "essential role" in securing Mr. Blue's convictions.  *Id.* at 13.

Mr. Blue asks the Court to distinguish between newly discovered evidence that is "impeaching" and that which is "merely impeaching."  *Id.* at 13-14.  He asserts, *id.* at 14: "Whether evidence undermining the credibility of a prosecution witness is impeaching or 'merely' impeaching depends on the quantum of evidence used to secure the conviction in the first place."  According to Blue, Gialamas's conviction and "apparent perjury" at his own trial are not "merely" impeaching.  ECF 131 at 13.  Arguing that Gialamas's criminal conviction would seriously undermine Gialamas's credibility at a trial, the defense insists that Gialamas's conviction "probably would have resulted either in suppression of the evidence or, alternatively acquittal" of Mr. Blue.  *Id.*

In *Custis*, 988 F.2d at 1359, the Court recognized that post-trial evidence that is "merely impeaching," *i.e.*, evidence that pertains "only to the credibility of a witness," generally "does not . . . warrant the granting of a new trial."  The question, then, is whether Gialamas's conviction is merely impeaching.

With respect to the claim of "apparent perjury" committed by Gialamas at his own trial, (ECF 131 at 13), Blue points to the State jury's guilty verdict as to Gialamas.  In Blue's view, because the jury convicted Gialamas, the jury necessarily rejected Gialamas's version of events as set forth in his trial testimony, and it follows that Gialamas's testimony at his own trial was false.  The defense suggested at the Motion hearing that Gialamas's conviction is not merely

impeaching, because of his perjury, and if there were a retrial of Mr. Blue, Gialamas's testimony at his own criminal trial would be admissible, at least in part.[12]

If Mr. Blue were retried, and if Gialamas were called as a witness, a court would, of course, permit introduction of Gialamas's conviction to impeach his testimony.[13]  Beyond the conviction itself, however, it is not clear how much the defense would be permitted to question Gialamas about the events involving Mr. Green or about Gialamas's testimony at his own trial.

To be sure, a party is generally permitted to question a witness about "crimes which by their nature bear directly upon the witness' propensity to testify truthfully."  *United States v. Cunningham*, 638 F.2d 696, 698 (4th Cir. 1981).  Congress defined this class of cases in terms "such as perjury or subornation of perjury, false statement, criminal fraud . . . or any other offense in the nature of *crimen falsi*, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully."  *Id.* (citation omitted).  However, Gialamas's offense of conviction – nonfeasance – is not a charge of perjury or false statement.  Nor has Gialamas been charged with perjury as a result of his testimony at his trial in State court.

Nonetheless, in addition to introduction of Gialamas's conviction at a retrial of Mr. Blue, a court might permit limited questions of Gialamas as to the nature of his underlying offense, the place of conviction, and his punishment.  *See United States v. Miller*, 478 F.2d 768, 769-70 (4th Cir. 1973).  This is because a party may question a witness as to specific instances of conduct

---

[12] I do not have a transcript of the oral argument at the Motion hearing on January 8, 2015.  Therefore, I have relied on my notes.

[13] Because Mr. Blue was acquitted of the charge pertaining to June 29, 2011, it is not entirely certain that the government would call Gialamas at a retrial of Mr. Blue.  Indeed, given Mr. Blue's acquittal on Count Two, it is not clear what evidence would be admissible as to the events of June 29, 2011.  The parties have not briefed that issue.

that are "probative of the character for truthfulness or untruthfulness" of the witness.  Fed. R. Evid. 608; *see also* Fed. R. Evid. 609(a).  But, if Mr. Blue were retried, this would not warrant a collateral retrial of Sergeant Gialamas at a retrial of Mr. Blue.  *See United State v. Estrada*, 430 F.3d 606, 616 (2nd Cir. 2005) (Sotomayor, J.); *see also United States v. Samuel*, 431 F.2d 610, 613 (4th Cir. 1970).

Moreover, I have read the testimony of Gialamas from his trial, submitted as a defense exhibit.  *See* ECF 131-6.  In my view, there is very little of Gialamas's actual trial testimony that would be admissible in evidence if Mr. Blue were retried.

With respect to my analysis, *United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010), is instructive.  There, the defendant was convicted of twelve drug and firearm offenses following parallel investigations by two groups of law enforcement officers.  *Id.* at 946.  State officers in the Criminal Investigation Division ("CID"), with the assistance of ATF, investigated a string of residential firearm burglaries involving the defendant.  *Id.* at 945.  Officers in the Narcotics Division ("ND") conducted their own investigation of drug dealing in and around the defendant's home.  *Id.* at 947.  Federal and State search warrants were executed.  *Id.* at 947-48.  At trial, evidence from the searches was introduced, along with testimony from CID officers, ATF agents, ND officers, and 19 cooperating witnesses and co-defendants.  *Id.* at 946.

After the trial, the defendant learned that some of the ND officers had engaged in unrelated misconduct.  *Id.* at 946-48.  A subsequent investigation resulted in the termination or resignation of four of the officers.  *Id.* at 945-46.  As a result, the defendant moved for a new trial on all counts.  *Id.* at 948.  The district court granted the motion as to the six counts that involved the ND officers, but not as to the six counts based on evidence gathered by CID officers and ATF agents pursuant to federal search warrants.  *Id.*  The Fourth Circuit affirmed.

As to the non-dismissed counts, the evidence was "merely" impeaching, because the discharged officers' testimony had been "amply corroborated" by other law enforcement officials and confederates of Robinson. *Id.* at 949. The Court said: "If Robinson is . . . contending that the misconduct evidence serves some purpose other than impeachment, we are at a loss as to what that purpose could be." *Id.* at 949. The Court added, *id.*: "Unlike the evidence in those few cases in which we have ordered or allowed a retrial, the misconduct evidence does not directly support some alternate theory of the crimes, nor does it provide any legal justification for Robinson's actions." That is also true here.

Both the *Custis* Court, 988 F.2d at 1359, and the *Robinson* Court, 627 F.3d at 949, cited the case of *United States v. Taglia,* 922 F.2d 413 (7th Cir. 1991) (Posner, J.). In *Taglia*, a key government witness was found to have given false testimony in prior cases. The Seventh Circuit said: "If the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases, the district judge would have the power to grant a new trial. . . ." *Id.* at 415. *See also United States v. Quiles*, 618 F.3d 383, 392 (3rd Cir. 2010) (involving post-trial conviction of a government witness and stating that "long experience has shown that newly discovered evidence that is *merely* impeaching is unlikely to reveal that there has been a miscarriage of justice") (emphasis in *Quiles*).

It is clear from the cases referenced above that I must consider whether the government's case was founded "entirely on the uncorroborated testimony" of Gialamas. *Taglia*, 922 F.2d at 415. The defense asserts, ECF 131 at 18: "No other witness claimed to have seen an object pass between the two men" on June 29, 2011. That assertion is simply not accurate. Indeed, it

completely ignores the trial testimony of H.F., as well as the testimony of Bearde and the information captured by the surveillance cameras.

Certainly, the testimony of Sergeant Gialamas was highly relevant to the alleged drug activities of Mr. Blue on June 29, 2011.  But, as to the events of June 29, 2011, I did not rely solely on Gialamas's testimony in making my pretrial ruling at the motions hearing.  Nor did the government's case depend only on Gialamas's testimony at the trial.  In other words, this is not a case that "rested entirely on the uncorroborated testimony of a single witness. . . ." *Taglia*, 922 F.2d at 415.

As I have already recounted, at the pretrial motions hearing and at trial, TFO Bearde corroborated most of Gialamas's testimony.  He stated, for example, that the C.S. placed an order with Mr. Townsend for 50 grams of heroin.  Although Bearde testified that he did not see the exchange between Townsend and Blue, because his view was blocked, he heard Gialamas contemporaneously announce his observation of a drug transaction.  And, at trial, H.F., the confidential source, testified to the same events.  In sum, H.F. recounted that, in the presence of Gialamas and Bearde, he telephoned Mr. Townsend to order heroin.  And, within 15 minutes of that phone call, Townsend encountered Blue on the street.  Like Gialamas, H.F. also saw "a hand-to-hand transaction" between the two men.  ECF 119 at 87.  Moreover, 50 grams of heroin were recovered from Townsend immediately after Townsend met with Blue, which was the precise quantity ordered by H.F.  In addition, the pole cameras documented that Townsend encountered Blue on the street, the two men met almost face-to-face, and Townsend put something in his pocket at the encounter with Blue.

To be sure, neither Gialamas nor H.F. could identify the object that led to their conclusion that a hand-to-hand drug transaction took place between Blue and Townsend.  But,

under all the circumstances, it was quite reasonable for them to infer, based on the totality of the circumstances, that a hand-to-hand drug transaction occurred.

Many courts have found probable cause as to a drug transaction, based on the totality of circumstances, even if a trained, experienced  police officer was not actually able to see whether the object transferred by one person to another was, in fact, contraband.  *See, e.g., United States v. Lucas*, 778 F.2d 885, 886-88 (D.C. Cir. 1985) (per curiam) (noting that although officer only saw suspect's receipt of an unidentified "object" in hand-to-hand transaction, officer's experience observing drug-related transactions and his knowledge of previous drug arrests in the area contributed to finding of probable cause); *United States v. Green*, 670 F.2d 1148-1150-51 (D.C. Cir. 1981) (upholding probable cause based, in part, on defendant's movements and mannerisms, including movement of hands, as "typical of a two-party narcotics transaction," even though police officer could not see the exchanged object, because of experience of police officers and occurrence "in an area noted for the regularity of narcotics trafficking."); *Moore v. Hearle*, 639 F. Supp. 2d 352, 356 (S.D.N.Y. 2009) (finding, in a civil rights case, that police had probable cause for arrest because, *inter alia*, officer had knowledge of suspect's criminal history, suspect displayed nervous behavior, and officer observed suspect making a hand-to-hand exchange in a high crime area); *People v. Rodriguez*, 828 N.Y.S.2d 62, 63 (N.Y. App. Div. 2007) (affirming denial of motion to suppress, noting defendant's "brief conversation" in "drug prone location," exchange of money for unidentified object fitting in hand, and stating that "'any person . . . using good common sense'" would have known defendant was selling drugs) (citation omitted); *State v. Castro*, 891 A.2d 848, 854 (R.I. 2006) (finding probable cause for arrest based on extensive experience of detective, who saw exchange of money for small white bag in area of high crime; *State v. Moore*, 853 A.2d 903, 907 (N.J. 2004) (upholding warrantless arrest by

experienced police officer in neighborhood known for heavy drug trafficking; the police officer witnessed  money given in exchange for "small unknown objects"); *Prince v. United States*, 825 A.2d 928, 930, 933-34 (D.C. App. 2003) (finding probable cause for arrest based on exchange of money for a "small object," and stating that "it is not necessary that the police officer be able to see clearly that the small object being handed from one person to another is contraband"); *Darling v.* State, 768 A.2d 463, 466 (Del. 2001) (stating that "personal observations by an experienced police officer at a known open-air drug sale area constituted sufficient probable cause to arrest [suspect] for contraband drug dealing"); *Commonwealth v. Kennedy*, 690 N.E.2d 436, 438-39 & n.2 (Mass. 1998) (finding probable cause for arrest where officer with "extensive experience in street level narcotics sale," witnessed exchange of unidentified objects through car window in high drug area with a known drug dealer); *People v. Jones*, 683 N.E.2d 14, 15 (N.Y. 1997) (finding probable cause based on single exchange of unidentified object "in a manner typical of a drug sale," such as transfer of money in high drug location and "furtive" conduct); *Commonwealth v. Santaliz*, 596 N.E.2d 337, 339-40 (Mass. 1992) (finding probable cause for arrest based on observations and experience of police officer who saw exchange of small object from waistband for money, furtive actions of participants, in high crime area); *United States v. White*, 655 F.2d 1302, 1303-04 (D.C. Cir. 1981) (upholding finding of probable cause for arrest based on exchange of currency for small object in high narcotics area); *Tobias v. United States*, 375 A.2d 491, 494 (D.C. App. 1977) ("The exchange of small objects for currency is an important and sometimes decisive factor in determining the existence of probable cause").

In any event, Blue was acquitted on Count Two, which pertained solely to the events of June 29, 2011.  And, Gialamas's testimony had little bearing on the two counts for which Blue

was convicted, pertaining to July 13, 2011.  Therefore, as the government puts it, "it is unclear what result Blue believes would occur if he had a new trial."  ECF 129 at 8.

In sum, I agree with the government that Sergeant Gialamas's conviction amounts to mere impeachment evidence of Gialamas.  Sergeant Gialamas's conviction for nonfeasance is a dereliction of duty offense.  As the State prosecutor acknowledged, the offense did not involve Gialamas's veracity or his truthfulness.  ECF 129-2.  Gialamas's conviction does not support an alternate theory of the crime, and Gialamas's misconduct did not pertain to or relate to the investigation of Blue.  And, as discussed, there was significant other evidence that corroborated Gialamas's testimony as to the events of June 29, 2011.

In *Quiles*, 618 F.3d at 392, the Third Circuit observed that a court that is asked to grant a new trial must "examine whether the defendant has demonstrated the necessary exculpatory connection between the [newly discovered] evidence and the offense or has demonstrated that the newly discovered evidence totally undermined critical inculpatory evidence."  Here, the newly discovered evidence, *i.e.*, Gialamas's conviction, does not "throw severe doubt on the truthfulness of the critical inculpatory evidence that had been introduced at [Blue's] trial."  *Id.* at 393.  Nor does it "severely weaken" the "critical evidence" presented by the government, so as to justify a new trial.  *Id.* at 394.

To the contrary, Gialamas's conviction amounts to a "textbook . . . example of impeachment evidence. . . ."  *Robinson*, 627 F.3d at 949.  What the *Robinson* Court said with respect to subsequent and unrelated police misconduct evidence seems apt here, *id.*:

> The officers' misconduct, while serious, did not relate to [the defendant's] case or to the truth-finding function of the criminal proceeding.  We thus reiterate our reluctance to order retrials because of subsequently discovered impeachment evidence.  To do so would invite fishing expeditions into the backgrounds of witnesses. . . .  Such a development could . . . undermine the finality of criminal proceedings to an unacceptable degree.

27

***

Misconduct evidence like this, which involved witnesses in [the defendant's] case but did not relate to those witnesses' investigation of that case, is likely to push the parties toward miniature credibility trials and to cut into the limits the Rules of Evidence place on information about diversionary and subsidiary issues. *See Custis*, 988 F.2d at 1359 n. 1; Fed. R. Evid. 403; Fed. R. Evid. 608(b). Retrials based on such evidence combine these inherent problems with the added cost and delay of a new trial.

### Conclusion

Mr. Blue has not demonstrated that Sergeant Gialamas's conviction, if introduced at trial, would be other than mere impeachment evidence, or that it would "probably produce an acquittal." *Custis*, 988 F.2d at 1359. As I see it, Mr. Blue has generated a lot of smoke, but no fire. This is not the "exceptional 'rare case' where a new trial might be granted 'solely on the basis of newly discovered impeachment evidence,'" because the government's case did not rest "'entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed. . . .'" *United States v. Reams*, 359 Fed. App'x. 366, 368 (4th Cir. 2009) (citations omitted) (some internal quotation marks omitted).

The Motion is DENIED. An Order follows.

Date:   February 27, 2015                               /s/
                                              Ellen L. Hollander
                                              United States District Judge